PEOPLE v WILSON

PEOPLE v AARON BANKS

Docket Nos. 101870, 102007. Argued November 12, 1996 (Calendar Nos. 3-4). Decided May 28, 1997.

Amir J. Wilson was convicted by a jury in the Muskegon Circuit Court, Michael E. Kobza, J., of possession with intent to deliver between 50 and 225 grams of a controlled substance and of conspiracy with intent to deliver between 50 and 225 grams of cocaine. In a separate trial in the Muskegon Circuit Court, Michael E. Kobza, J., arising out of the same circumstances, Aaron L. Banks was convicted of possession of less than 50 grams of cocaine with intent to deliver and conspiracy to possess less than 25 grams. Thereafter, an Oakland County citizens grand jury indicted Wilson, Banks, and others for conspiring from October 1988 to December 1990 to possess with intent to deliver over 650 grams of cocaine. The 45-B District Court, John H. Norton, J., denied Wilson's and Banks' motion to set aside the indictment on double jeopardy grounds. After a joint jury trial in the Oakland Circuit Court, Robert C. Anderson, J., Wilson was convicted of conspiracy to deliver between 50 and 250 grams of cocaine, and Banks was convicted of conspiracy to possess with intent to deliver more than 650 grams of cocaine. The Court of Appeals, WEAVER, P J., and CAVANAGH and C. C. SCHMUCKER, JJ, affirmed in an unpublished opinion per curiam (Docket Nos. 146693, 146695).

In an opinion by Justice BRICKLEY, joined by Chief Justice MALLETT and Justice CAVANAGH, the Supreme Court held:

The subsequent prosecution in the Oakland Circuit Court is barred by the United States and Michigan Constitutions.

1. If a defendant can make a prima facie showing of a violation of the Double Jeopardy Clause, a second prosecution is barred unless the government can demonstrate by a preponderance of the evidence why double jeopardy principles do not bar prosecution. In order to make a prima facie case of double jeopardy, a defendant must show prosecution twice for the same offense. The same offense includes prosecution for a greater crime after conviction of a lesser included offense. Conspiracy to possess with intent to deliver 50 to 224 grams of cocaine is a lesser included offense of

conspiracy to possess with intent to deliver over 650 grams. Under the facts of this case, only one conspiracy existed, and the defendants have made a showing of double jeopardy.

2. The people argue that the second prosecutions were valid under *Brown v Ohio*, 432 US 161 (1977), which held that an exception to double jeopardy may exist where the state is unable to proceed on the more serious charge at the outset because additional facts necessary to sustain that charge had not occurred or had not been discovered despite the exercise of due diligence. However, in this case, the people failed to show why the greater conspiracy could not have been discovered despite the exercise of due diligence. The convictions were based on the same arrest and seizure of cocaine. The counties are not separate sovereigns, but are subdivisions of the state. Any information the Muskegon authorities knew or could have known in the exercise of due diligence must be imputed to the Oakland authorities. The state is allowed only one prosecution, and that occurred in Muskegon. The second prosecution for the greater offense is barred.

Vacated and reversed.

Justice BOYLE, joined by Justice RILEY, concurring in part and dissenting in part, stated that the prosecution of Aaron Banks in Oakland County was not barred by double jeopardy. The agreement to purchase and process drugs in Oakland County was not part of the Muskegon County conspiracy, but, rather, was a distinct and separate crime. Therefore, the Muskegon County conspiracy was not a lesser included offense of the Oakland County conspiracy under federal law, nor was the Oakland County conspiracy, discovered after the Muskegon County prosecution, part of the same transaction under state law. The due diligence exception applied to Aaron Banks' involvement in the Oakland County conspiracy because the facts concerning the greater conspiracy became known only after prosecution for the smaller conspiracy.

Justices WEAVER and KELLY took no part in the decision of these cases.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *Richard Thompson*, Prosecuting Attorney, and *Joyce F. Todd*, Chief, Appellate Division, and *Anica Letica*, Assistant Prosecuting Attorney, for the people.

*Gary L. Kohut* and *Brian R. Sullivan* for defendant Wilson.

*Michael J. Sharpe* for defendant Banks.

BRICKLEY, J. The defendants were charged in Oakland County with conspiracy to possess with intent to deliver over 650 grams of a controlled substance. They were previously convicted in Muskegon County of conspiracy to possess with intent to deliver cocaine. Because both prosecutions center on the same dates, witnesses, and evidence, we granted leave to appeal, limited to the double jeopardy implications of the defendants' prosecutions in Oakland County.

We hold that the subsequent prosecution in Oakland County is barred by the Constitution of the United States and the Michigan Constitution. Therefore, the later convictions are reversed and vacated.

I

A

On December 11, 1989, Ronald Gardner, Cato Peterson, Amir Wilson, and Aaron Banks were traveling in a white Cougar automobile from Detroit to Muskegon. Muskegon County Sheriff Deputy Al VanHemert received a tip from a confidential informant that Aaron Banks and several other persons would be transporting crack cocaine to a Muskegon Heights neighborhood that afternoon.

Deputy VanHemert and another deputy, Stanley Berdinski, executed a legal stop and search of the vehicle. The deputies seized approximately 222 grams of crack cocaine and arrested the occupants of the vehicle.

Ronald Gardner, Cato Peterson, and Amir Wilson each made statements to the officers. Mr. Gardner

stated that he was paid two hundred dollars by Ricky Franklin to drive Messrs. Peterson, Wilson, and Banks to the Muskegon Heights area and that he had previously transported sellers and drugs to that area. He also stated he had picked up money at the home of "Miss Louise" in Muskegon and transported the cash back to Detroit.

Further, Gardner stated that Mr. Franklin was the head of the organization. He stated that cocaine was sometimes transported in the spare tire in the trunk, that the cocaine would be placed into the spare tire at a gas station in Detroit, and the tire would be left behind a warehouse in Muskegon after the cocaine was removed. He knew where Ricky Franklin lived and was willing to show the officers where the warehouse was located. Additionally, Gardner stated he sold drugs for Aaron Banks, that Banks was the boss of the Muskegon operation, and that Franklin gave the drugs to Banks to sell.

Mr. Peterson stated to the officers that he was traveling to Muskegon to sell crack cocaine, that this was his second trip to Muskegon, and that Mr. Franklin was the head of the organization.

Defendant Wilson also made a statement to the Muskegon authorities after his arrest. He stated that he sold crack cocaine for Ricky Franklin and that he had sold drugs on three previous trips to Muskegon. He stated that Mr. Banks would stay at Miss Louise's house and dispense the crack baggies to the sellers there. Further, he stated that the cocaine was transported in the spare tire in the trunk, that it was easy to recruit sellers from Detroit, and that Mr. Robert Johnson was also involved in the sale of cocaine.

The Muskegon County Prosecutor charged defend-
ants Wilson and Banks with possession of a con-
trolled substance with intent to deliver between 225
and 650 grams.[1] The charges were reduced after the
cocaine was weighed to possession with intent to
deliver between 50 and 225 grams of cocaine and con-
spiracy to possess with intent to deliver.[2]

On June 6, 1990, Amir Wilson was convicted by a
Muskegon County jury of possession with intent to
deliver and conspiracy to deliver between 50 and 225
grams of cocaine. On July 3, 1990, Mr. Wilson was
sentenced to two concurrent prison terms of eight to
twenty years. On June 11, 1990, Mr. Banks was con-
victed in Muskegon County of possession of less than
50 grams of cocaine[3] and conspiracy to possess less
than 25 grams[4] arising out of the December 11, 1989,
arrest. He was sentenced to ten to twenty years in
prison and two years eight months to four years in
prison, respectively.[5]

B

On July 5, 1990, Southfield police arrested Gerald
Hill for possession with intent to deliver between 225
and 649 grams of cocaine.[6] Oakland County officials

---

[1] MCL 333.7401(2)(a)(ii); MSA 14.15(7401)(2)(a)(ii).

[2] MCL 333.7401(2)(a)(iii); MSA 14.15(7401)(2)(a)(iii). The conspiracy
count was not for a specific amount of cocaine.

[3] MCL 333.7401(2)(a)(iv); MSA 14.15(7401)(2)(a)(iv).

[4] MCL 333.7403(2)(a)(v); MSA 14.15(7403)(2)(a)(v).

[5] Cato Peterson and Ronald Gardner were both given reduced
sentences for their cooperation with the investigation, including testifying
against defendants Wilson and Banks.

[6] Southfield police made the arrest after a routine traffic stop of the
vehicle in which Mr. Hill was a passenger. The vehicle was also occupied
by Ricky Franklin. The police allowed Mr. Hill to go into a store across
the street from where the vehicle was stopped. After Mr. Hill left the area,

began an investigation into Mr. Franklin's drug activities. At this time, the Muskegon and Oakland Counties Sheriff Departments joined efforts to investigate the "Franklin organization."

In December 1990, an Oakland County citizens grand jury indicted Messrs. Wilson, Banks, Hill, Johnson, and another individual, Terrence Moore,[7] on charges of conspiring from October 1988 to December 1990 to possess with intent to deliver over 650 grams of cocaine.[8]

Defendants Wilson and Banks moved to set aside the indictment on the basis of a violation of double jeopardy. Their motion was denied. Messrs. Wilson, Banks, Hill, and Johnson were jointly tried in September of 1991. Messrs. Wilson and Banks renewed their motion to dismiss at trial, and, again, the motion was denied. After the second trial, defendant Wilson was found guilty of conspiracy to deliver between 50 and 250 grams of cocaine. Defendant Banks was found guilty of conspiracy to possess with intent to deliver more than 650 grams of cocaine. The defendants appealed, and the Court of Appeals affirmed.[9] We

---

store employees alerted police officers that they had found cocaine in a jacket behind the store.

[7] The record indicates that Mr. Franklin has fled this state in order to avoid prosecution.

[8] MCL 333.7401(2)(a)(i); MSA 14.15(7401)(2)(a)(i).

[9] The Court of Appeals did not inquire into the argument that there was more than one conspiracy. The Court stated:

It is clear that Muskegon County could not have known the extent of the conspiracy at the time of defendants' convictions. Because the crime could not be discovered, despite diligence on the part of the police, until after the commencement of the prosecution for other crimes arising from the same transaction, an exception to the same transaction rule allows a separate prosecution. *People v Harding*, 443 Mich 693; 506 NW2d 482 (1993). [*People*

granted leave, limited to the double jeopardy issue. 450 Mich 904 (1995).

II

The Fifth Amendment of the United States Constitution provides that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb . . . ." The Fifth Amendment double jeopardy protections are applicable to the states through the Fourteenth Amendment. *Benton v Maryland*, 395 US 784; 89 S Ct 2056; 23 L Ed 2d 707 (1969). "The language of the Michigan Constitution's double jeopardy provision is substantially similar to that of the United States Constitution." *People v Mezy*, 453 Mich 269, 279; 551 NW2d 389 (1996). Michigan's Constitution, art 1, § 15, declares that "[n]o person shall be subject for the same offense to be twice put in jeopardy." Further, Michigan had codified the guarantee against double jeopardy.[10]

The double jeopardy guarantee protects against successive prosecutions for the same offense and protects against multiple punishments for the same offense. *North Carolina v Pearce*, 395 US 711, 717; 89 S Ct 2072; 23 L Ed 2d 656 (1969). The double jeopardy protections are inherent in our system of jurisprudence because we believe that

---

*v Moore*, unpublished opinion per curiam, issued November 28, 1994 (Docket No. 145614), p 3.]

[10]   When a defendant shall be acquitted or convicted upon any indictment for an offense, consisting of different degrees, he shall not thereafter be tried or convicted for a different degree of the same offense; nor shall he be tried or convicted for any attempt to commit the offense charged in the indictment or to commit any degree of such offense. [MCL 768.33; MSA 28.1056.]

the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty. [*Green v United States*, 355 US 184, 187-188; 78 S Ct 221; 2 L Ed 2d 199 (1957).]

We follow the federal rule that if a defendant can make a prima facie showing of a violation of the Double Jeopardy Clause, a second prosecution is barred unless the government can demonstrate by a preponderance of the evidence why double jeopardy principles do not bar prosecution. *Mezy, supra* at 277.

In order to make a prima facie case of double jeopardy, the defendant must show that he was prosecuted twice for the same offense. The same offense includes prosecution for a greater crime after conviction of the lesser included offense. See *Brown v Ohio*, 432 US 161, 169; 97 S Ct 2221; 53 L Ed 2d 187 (1977). Conspiracy to possess with intent to deliver 50 to 224 grams of cocaine is a lesser included offense of conspiracy to possess with intent to deliver over 650 grams. See *People v Marji*, 180 Mich App 525, 531; 447 NW2d 835 (1989).

Initially, in its brief to this Court in *Wilson*, the prosecution's only argument that more than one conspiracy existed is as follows,

In *People v Mezy*, 453 Mich 269; 551 NW2d 389 (1996), this Honorable Court recently discussed the problem of determining whether there were two separate drug conspiracies or only one. A further problem is presented in dealing what the Court of Appeals has previously referred to as a "chain conspiracy." *People v Meredith (On Remand)*, 209

Mich App 403; 531 NW2d 749 (1995), lv den 450 Mich 852 (1995).

As can be seen from the People's counter-statement of facts, drug conspiracies involve many individuals, who may have no knowledge of other conspirators or even the extent of the conspiracy when they become involved in it. In addition, as is again demonstrated in this case, certain individuals may only be known to others by a nickname. Further complicating prosecution in drug offenses is the fear inspired by such organizations, resulting in uncooperative witnesses and, as evidenced by Gardner's and Cato Peterson's statements in this case, a failure to fully disclose their own or others' participation in the conspiracy.[11]

Contrary to the position of the dissent, the people's argument is not that this Court should find that more than one conspiracy existed, it is that this Court should hold that the *Brown* exception applies.

Moreover, in the Oakland County case, the people did not charge the defendants with separate conspiracies for agreements that occurred after the December 11, 1989, arrest of these defendants. The defendants were bound over only on one count of conspiracy to deliver or manufacture a controlled substance, MCL 333.7401(2)(a)(i); MSA 14.15(7401)(2)(a)(i).

Even assuming that the prosecution makes the argument alleged by the dissent, I would still hold that there was only one conspiracy. "The gist of the crime of conspiracy is the agreement of the conspirators to commit one or more unlawful acts, where one or more of the coconspirators do 'any act to effect the object of the conspiracy.' " *Mezy* at 284, quoting

---

[11] In its brief in *Banks*, the people merely incorporate its brief for codefendant Wilson, and then argue that the *Brown* exception should apply to this case.

*Braverman v United States*, 317 US 49, 53; 63 S Ct 99; 87 L Ed 23 (1942). We continued in *Mezy:*

> In order to determine what the extent of the agreement is, so that we may determine whether there are two conspiracies or only one, we will use the same "totality of the circumstances" test used in constitutional double jeopardy analysis. This test includes the following factors: 1) time, 2) persons acting as coconspirators, 3) the statutory offenses charged in the indictments, 4) the overt acts charged by the government or any other description of the offenses charged that indicate the nature and scope of the activity that the government sought to punish in each case, and 5) places where the events alleged as part of the conspiracy took place. The essence of the determination is whether there is one agreement to commit two crimes, or more than one agreement each with a separate object. [*Mezy, supra* at 285, citing *United States v Thomas*, 759 F2d 659 (CA 8, 1985).][12]

First, we will explore the time factor. The time frames of the two alleged conspiracies overlap. The felony information for the Muskegon conspiracy does not list a specific time frame. However, at Wilson's trial in Muskegon, the prosecutor argued that the agreement took place between December 7 and December 11. Also, the jury in Banks' case was instructed that the prosecution alleged the agreement was made between December 7 and 11, 1989. The overlap in time does not prove that there was only one conspiracy because "many drug offenses occur at

---

[12] In *Thomas*, the court held that there was more than one agreement. However, the facts of *Thomas* are significantly different than those in this case. In *Thomas*, the defendants were charged with conspiracy to travel interstate for the promotion of unlawful activity arising out of hidden interests by organized crime groups in casinos. The defendants were skimming off of different casinos with different partners in the second conspiracy. Therefore, there was more than one agreement.

the same time without being connected," *Mezy, supra* at 288 (BRICKLEY, C.J., concurring in part and dissenting in part). However, unlike *Mezy*, the facts of this case indicate that there was only one agreement when the other elements of the test are reviewed.

The Muskegon trial was based on an alleged conspiracy between Cato Peterson, Ronald Gardner, Rick Franklin, Amir Wilson, and Aaron Banks. It was alleged by the Muskegon authorities that Franklin was the leader of the conspirators, Aaron Banks acted as a distributor of the cocaine in Muskegon, and cocaine was brought to Muskegon from the Metro Detroit area. In the Oakland County prosecution, it was alleged that Ricky Franklin was the leader of the conspirators, that Aaron Banks acted as a distributor (as did Robert Johnson), and that the cocaine was transported to Muskegon from the City of Detroit and certain areas of Oakland County. The difference was that additional conspirators were indicted in the Oakland County case. All the conspirators in the Muskegon case were considered conspirators in the Oakland County case, whether indicted or not.

Additionally, the statutory offenses were essentially the same. In Muskegon County, the defendants were charged with possession with intent to deliver between 50 and 225 grams of cocaine and conspiracy to possess with intent to deliver. However, no amount was addressed with respect to the conspiracy count. In Oakland County, the defendants were charged with conspiracy to possess with intent to deliver more than 650 grams of a controlled substance. Therefore, the defendants were charged with a greater crime after being convicted of the lesser included offense. *Marji, supra* at 531.

The overt acts and offenses described by the people for both cases were similar. In fact, in the Oakland County case, the people spent one and one-half days recounting to the jury the facts of the Muskegon case. The same police officers and detectives testified about the same events, in the same location, involving the same evidence. Further, the same witnesses testified about the same events, in the same location, involving the same evidence. Essentially, the Oakland County trial was the Muskegon trial, plus more evidence of events that occurred after the defendants' roles in the conspiracy ended.[13]

Also, the locations of the conspiracies were the same. The dissent makes much of the fact that one witness, Jeremiah Perry, testified that he told the police that Ricky Franklin sold drugs in Muskegon, Grand Rapids, Benton Harbor, Kalamazoo, Minnesota, Pittsburgh, Ft. Wayne, Indiana, and Lima, Ohio. However, this information was brought out on cross-examination when counsel for codefendant Terrence Moore indicated that Perry could only link Mr. Moore to transactions in Muskegon, not to any other sales he may have mentioned to the police. Furthermore, the prosecution did not link any of these sales to the conspiracy that was charged, and Perry only testified to agreements to sell in Muskegon.[14]

Finally, we note that Wilson's and Banks' parts in this conspiracy ended when they were arrested on

---

[13] The testimony of Mr. Dwayne Albert Winn was read into the record. Mr. Winn stated that Aaron Banks distributed the cocaine and collected the money from the sellers in Muskegon. However, this was known by the Muskegon authorities and alleged at the trial in Muskegon. Mr. Winn's testimony did no more than add weight to the testimonies of Detective VanHemert, Cato Peterson, and Ronald Gardner.

[14] Perry's testimony dealt only with sales in Muskegon.

December 11, 1989. In *United States v Goff*, 847 F2d 149, 169 (CA 5, 1988), the United States Court of Appeals for the Fifth Circuit differentiated between the end of a conspiracy and the end of an individual's role in a conspiracy. " 'It is well settled that a person's participation in a conspiracy ends when the person is arrested for his role in the conspiracy.' " (Quoting *United States v Dunn*, 775 F2d 604, 607 [CA 5, 1985].) However, solely because a single individual's part may have ended, the conspiracy does not necessarily end. "Even when several members of a conspiracy are arrested, the conspiracy itself is not thereby necessarily terminated." *Goff* at 170, citing *United States v Kalish*, 690 F2d 1144, 1151 (CA 5, 1982). "Drug conspiracies involving multiple importation episodes may continue for many months." *Goff* at 170.

In *Goff*, the same four persons were involved in multiple shipments. The court found that even though other personnel continually changed, there was only one conspiracy. The same is true in the instant case. Ricky Franklin and Martese Weidaman were the constant leaders of this conspiracy. Wilson's and Banks' involvement in the conspiracy ended after their arrest on December 11, 1989. There was no evidence that Wilson or Banks continued to conspire with Franklin, nor was there evidence that they participated in any activity in furtherance of the conspiracy.[15]

Wilson and Banks made only one agreement with the other members of their conspiracy. That agree-

---

[15] There was an inference made that Aaron Banks contacted one of the witnesses, Ronald Gardner, just after their arrest in Muskegon and suggested that Gardner should hire Banks' attorney. However, the Oakland County judge ruled that this testimony was irrelevant because there was no indication that this was done to silence Gardner.

ment was to transport cocaine that was obtained by
Ricky Franklin to Muskegon, and to sell the same
cocaine in a neighborhood in Muskegon known as the
"danger zone." Each trip to Muskegon was not a sepa-
rate conspiracy. To say that each trip could be consid-
ered a separate conspiracy, or that each sale could be
a separate conspiracy, would lead to the exact results
sought to be prevented by the Double Jeopardy
Clause—subjecting the defendant to the "hazards of
trial and possible conviction more than once for an
alleged offense." *Green, supra* at 187. Therefore, we
find that only one conspiracy existed under the facts
of this case, and that the defendants have made a
showing of double jeopardy.

The burden now shifts to the people to demon-
strate by a preponderance of the evidence why
double jeopardy principles do not bar prosecution.
*Mezy, supra* at 277. The people argue that the second
prosecution was valid under the exception in *Brown,
supra* at 169. The United States Supreme Court held
in *Brown* that "[w]hatever the sequence may be, the
Fifth Amendment forbids successive prosecution and
cumulative punishment for a greater and lesser
included offense." *Id.* The Court further stated:

> An exception may exist where the State is unable to pro-
> ceed on the more serious charge at the outset because the
> additional facts necessary to sustain that charge have not
> occurred or have not been discovered despite the exercise
> of due diligence. [*Id.* at 169, n 7, citing *Diaz v United
> States*, 223 US 442, 448-449; 32 S Ct 250; 56 L Ed 500 (1912);
> *Ashe v Swenson*, 397 US 436, 453, n 7; 90 S Ct 1189; 25 L Ed
> 2d 469 (1970) (Brennan, J., concurring).][16]

---

[16] We adopted this exception in *People v Harding*, 443 Mich 693, 699-
705; 506 NW2d 482 (1993); *People v White*, 390 Mich 245, 258, n 6; 212
NW2d 222 (1973).

The people rely on this exception for its authority to circumvent double jeopardy requirements. However, the people have failed to show this Court why they could not have discovered the greater conspiracy despite the exercise of due diligence. In fact, the testimony at the Muskegon trial indicates that the Muskegon authorities knew that these two defendants were part of a larger conspiracy when they were tried in Muskegon.

The people argue that this Court should rely on the decision in *United States v Tolliver*, 61 F3d 1189 (CA 5, 1995). The *Tolliver* court held that "[f]rom the record, it is apparent that while the government may have *suspected the existence* of [a] conspiracy during the prosecution of [the defendant], at that time the government did not have sufficient evidence to indict [the defendant] for his participation in the . . . conspiracy."[17] *Id.* at 1211.

Unlike the facts of *Tolliver*, the Muskegon authorities knew of the existence of the Franklin organization. They knew that these defendants were directly involved in the conspiracy. The statements of Messrs. Gardner, Peterson, and Wilson indicated the manner in which the cocaine was transported (in spare tires), where the defendants stayed while in Muskegon (Miss

---

[17] In *Tolliver*, the defendant argued that the conspiracy count he was charged with was the same offense for which he had been previously convicted. He had been convicted of conspiracy with intent to distribute cocaine, possession with intent to distribute cocaine, and using and carrying firearms in relation to a drug trafficking offense.

The government did not dispute that the overt acts referred to in the superseding indictment were also the overt acts in the first conspiracy. The United States Court of Appeals for the Fifth Circuit held that the defendant proved a prima facie double jeopardy claim. The court then looked to see if the people could prove an exception by a preponderance of the evidence.

Louise's home), that the organization was headed by Ricky Franklin in Detroit, that others were involved, and that they had made previous trips to sell drugs in Muskegon.

There is evidence that Muskegon authorities had actual knowledge of the greater criminal organization. The testimony of the officers indicate that they had Miss Louise's home and her neighborhood and Aaron Banks under surveillance for some time. Further, the Muskegon authorities had arrested another member of the organization only weeks before the December 11, 1989, arrest.

The most telling reason for holding that the Muskegon authorities knew of the greater conspiracy, and with the exercise of due diligence could have produced additional evidence to support the greater charge, was the statement made by Mr. Wilson to Deputies VanHemert and Berdinski. Mr. Wilson stated that he had sold as much as $3,000 worth of crack cocaine in a single trip to Muskegon. Further, Mr. Wilson stated that Mr. Banks routinely transported money back to Detroit. When asked what was the most money he had seen transported back to Detroit, he responded, "Around a hundred thousand," and that was in the summer of 1989. This could have formed the basis for additional investigation by the Muskegon authorities.

Additionally, the convictions were based on the same arrest and seizure of cocaine. The initial convictions were for the December 11, 1989, incident and the second convictions were for a continuing conspiracy from October 1988 to December 1990. The people based the case against these defendants on the same cocaine that was seized on December 11, 1989. The

Oakland prosecution was based on the testimony of the same witnesses who testified at the Muskegon trial.[18] Any additional witnesses provided by the prosecution in the Oakland County case only added weight to the prosecution's case and did not form the basis for an additional separate crime.

Even though the Muskegon authorities did have actual knowledge of the greater conspiracy, the people failed to provide any evidence that the Muskegon authorities exercised due diligence in investigating this organization.

The people argue that Messrs. Gardner and Peterson minimalized their involvement in the organization and that therefore the people could not have known of the greater organization at the time of the first trial. However, the actual statements and trial testimony given by the witnesses show that Messrs. Gardner and Peterson were willing to fully aid the investigation. Moreover, Oakland County had the necessary information to get a grand jury indictment within six months of the sentencing following the first trial of Messrs. Wilson and Banks.

Finally, the knowledge of the Muskegon authorities is imputed to the Oakland County authorities. Therefore, Oakland County is deemed to know all that the Muskegon County authorities knew. As stated in *Waller v Florida*, 397 US 387, 392; 90 S Ct 1184; 25 L Ed 2d 435 (1970):

---

[18] Ronald Gardner, Cato Peterson, Deputies Dale Gooden and August Panici testified at both trials. Deputy Berdinski had died between the two trials. Deputy VanHemert's Oakland County preliminary examination testimony was read into the record in the Oakland County trial.

"Political subdivisions of States—counties, cities, or whatever—never were and never have been considered as sovereign entities. Rather, they have been traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions." [Quoting *Reynolds v Sims*, 377 US 533, 575; 84 S Ct 1362; 12 L Ed 2d 506 (1964).]

In *Waller*, the United States Supreme Court overturned the second conviction of the defendant in a state court because the defendant had been tried and convicted previously in a municipal court. The Court held that the second prosecution violated the Double Jeopardy Clause because the prosecutions were by the same sovereign. The counties of Muskegon and Oakland are not separate sovereigns; they are subdivisions of this state. Therefore, we impute the knowledge of the Muskegon authorities to the Oakland County authorities. Any information that the Muskegon authorities knew or could have known if they exercised due diligence in investigating this drug conspiracy will be imputed to the Oakland authorities. Therefore, the state is allowed only one prosecution and that occurred in Muskegon.

III

CONCLUSION

On the basis of the statements of Messrs. Gardner, Peterson, and Wilson, and the evidence introduced at the first trial, the Muskegon prosecutor could have charged Messrs. Wilson and Banks with conspiracy to possess with intent to deliver over 650 grams of cocaine. The prosecutor chose not to do so and charged the defendants with the lesser offense. The second prosecution for the greater offense consti-

tuted double jeopardy. The people failed to prove to this Court by a preponderance of evidence that the exception articulated in *Brown* applies to this case. Therefore, we conclude that the second prosecution for the greater offense is barred.

MALLETT, C.J., and CAVANAGH, J., concurred with BRICKLEY, J.

BOYLE, J. (*concurring in part and dissenting in part*). While I agree with the majority's conclusion that the subsequent prosecution of defendant Amir Wilson is precluded by double jeopardy, I dissent from the majority holding that the prosecution in Oakland County of Aaron Banks was barred by the double jeopardy provision of the United States and Michigan Constitutions. *Ante* at 423. The prosecution of defendant Banks was not barred by the Fifth Amendment  of the United States Constitution as interpreted by the United States Supreme Court and lower federal courts or by the Michigan Constitution's Double Jeopardy Clause, governed by this Court's interpretation of the "same transaction" test as modified in *Crampton v 54-A District Judge*, 397 Mich 489; 245 NW2d 28 (1976).

The agreement to purchase and process drugs in Oakland County was not part of the Muskegon conspiracy, but, rather, was a distinct and separate crime. Therefore, the Muskegon conspiracy was not a lesser-included offense of the Oakland County conspiracy under federal law. Nor was the Oakland conspiracy, which was discovered after the Muskegon prosecution, part of the same transaction under state law. *Ante* at 429. Finally, I disagree with the majority's contention that the state has failed to demonstrate

that the due diligence exception does not apply to Aaron Banks' involvement in the Oakland conspiracy. The facts concerning the greater conspiracy became known only after prosecution for the smaller conspiracy.

I

The majority's statement that appellee does not contest the defendant's assertion that the second prosecution was for the same offense, *ante* at 428, is incorrect. Insofar as the statement implies that appellee has not preserved this claim, the prosecution argued in the alternative at the trial court level, in the Court of Appeals, and in the briefs in this Court, that there was more than one conspiracy. The question has been preserved and is properly before us. Both defendants have addressed the issue.[1] Indeed, the due diligence claim as an exception to *People v White*, 390 Mich 245, 258, n 6; 212 NW2d 222 (1973), argued by both the prosecution and the defendants, assumes that separate crimes have occurred as part of "one transaction." The scope of the inquiry before us thus necessarily includes whether there is one crime or two.

Given that the scope of the inquiry is not limited to whether the due diligence exception applies, the majority's initial inquiry should be directed to the procedural question regarding the burdens of proof and

---

[1] *United States v Williams*, 504 US 36, 40; 112 S Ct 1735; 118 L Ed 2d 352 (1992).

Before proceeding to the merits of this matter, it is necessary to discuss the propriety of reaching them. . . . Our traditional rule . . . precludes a grant of certiorari only when "the question presented was not pressed or passed upon below."

persuasion on a double jeopardy claim. In *People v Mezy*, 453 Mich 269; 551 NW2d 389 (1996), we recently adopted a procedural test from *United States v Thomas*, 759 F2d 659 (CA 8, 1985) (en banc), applicable to interlocutory appeals. Although we directed application of *Thomas* to a posttrial double jeopardy challenge, the majority of cases applying such a test have done so in the context of pretrial interlocutory appeal. Because the "government is clearly in a better position to show that the crime charged in the present indictment is not the same as the one charged in a previous indictment,"[2] defendant's burden on interlocutory appeal is to make a prima facie showing of the same offense, at which point the burden shifts to the government to show it has not twice prosecuted for the same conspiracy.[3] However, where, as here, review is of a posttrial double jeopardy claim, it has also been held that the defendant bears the traditional burdens[4] of both production and persuasion of

---

[2] *United States v Stricklin*, 591 F2d 1112, 1118 (CA 5, 1979), accord *United States v Garcia-Rosa*, 876 F2d 209, 229 (CA 1, 1989); *United States v Smith*, 82 F3d 1261, 1266 (CA 3, 1996); *United States v Ragins*, 840 F2d 1184, 1191-1192 (CA 4, 1988); *United States v Bendis*, 681 F2d 561, 564 (CA 9, 1981).

[3] See *United States v Booth*, 673 F2d 27, 29 (CA 1, 1982); *United States v Reiter*, 848 F2d 336, 341 (CA 2, 1988); *United States v Inmon*, 568 F2d 326, 332 (CA 3, 1977); *United States v Futch*, 637 F2d 386, 388 (CA 5, 1981); *United States v Jabara*, 644 F2d 574, 576 (CA 6, 1981); *United States v Thornton*, 972 F2d 764, 767 (CA 7, 1992); *United States v Tercero*, 580 F2d 312, 315 (CA 8, 1978); *United States v Sturman*, 679 F2d 840, 843 (CA 11, 1982).

[4] See note, *The burden of proof in double jeopardy claims*, 82 Mich L R 365 (1983). The burden of proof has traditionally been placed on the defendant to show "that the two crimes charged are the same in law and fact . . . ." The claim of double jeopardy is an affirmative defense that must be raised or will be considered waived. *Id.* at 365, n 2.

the existence of a single conspiracy. *United States v Dortch*, 5 F3d 1056, 1061 (CA 7, 1993).[5]

Were we writing on a clean slate, we might be persuaded by the rationale that because it is no longer possible to protect the defendant against double jeopardy exposure when the second trial has concluded,[6] and the prosecutor and defendant have equal access to the record, the defendant may carry the burden normally assigned to appellant without unreasonable strain. *United States v Stricklin*, 591 F2d 1112, 1124 (CA 5, 1979).

However, given that we have but recently applied *Thomas* in the posttrial setting, and applying that test to the *Blockburger*[7] inquiry, I conclude that defendant Wilson has made a prima facie showing that the prosecution has failed to overcome. However, double jeopardy does not bar Banks' second prosecution for the Oakland conspiracy.

---

[5] Those federal circuits applying the burden-shifting framework to posttrial review are the United States Court of Appeals for the Second Circuit, *United States v Mallah*, 503 F2d 971, 986 (CA 2, 1974), the Fifth Circuit, *United States v Kalish*, 690 F2d 1144, 1147 (CA 5, 1982), the Sixth Circuit, *United States v Adamo*, 742 F2d 927, 946-947 (CA 6, 1984), and the Eleventh Circuit, *United States v Loyd*, 743 F2d 1555, 1563 (CA 11, 1984). The balance of federal circuits have either retained the position that the defendant continues to carry the burden posttrial, the Third Circuit, *United States v Smith*, n 2 *supra* at 1266, the Fourth Circuit, *United States v Ragins*, n 2 *supra* at 1191-1192, the Ninth Circuit, *United States v Bendis*, n 2 *supra* at 564, and the Tenth Circuit, *United States v Sasser*, 974 F2d 1544, 1549, n 3 (CA 10, 1992), or have not reached the issue, the First Circuit, *United States v Garcia-Rosa*, n 2 *supra* at 229, n 17, and the Eighth, Federal, and District of Columbia Circuits.

[6] *United States v Chiattello*, 804 F2d 415, 417 (CA 7, 1986).

[7] *Blockburger v United States*, 284 US 299, 303; 52 S Ct 180; 76 L Ed 306 (1932).

II

On the merits, with regard to defendant Banks, there are three questions: (1) whether there was one conspiracy or two, which is the mirror image of the question whether the defendant was prosecuted twice for same offense under the federal test, (2) whether, if there was more than one offense, the same-transaction rule of *White, supra,* bars the second prosecution, and (3) if the answer to either of the previous questions would bar the Oakland prosecution, whether the due diligence exception applies.

As the United States Supreme Court has recently reiterated, "In both the multiple punishment and multiple prosecution contexts . . . where the two offenses for which the defendant is punished or tried cannot survive the 'same-elements' test, the double jeopardy bar applies." *United States v Dixon,* 509 US 688, 696; 113 S Ct 2849; 125 L Ed 2d 556 (1993). Rejecting as without constitutional roots the theory that double jeopardy has a different meaning in its successive prosecution and successive punishment strands, the Court overturned the "new, additional double jeopardy test," *Dixon, supra* at 703-704, announced in *Grady v Corbin,* 495 US 509, 510; 110 S Ct 2084; 109 L Ed 2d 584 (1990), that barred a subsequent prosecution if, "to establish an essential element of an offense charged in that prosecution, . . . the government will prove conduct that constitutes an offense for which the defendant has already been prosecuted . . . ." The Court rejected the same-conduct test, reaffirmed that it had "consistently rejected" the same-transaction test, *Dixon,*

*supra* at 709, n 14, and announced a return to *Blockburger*.[8]

### A

### AARON BANKS WAS CHARGED
### WITH TWO SEPARATE CONSPIRACIES

The majority's approach avoids the alternative argument of defendant Banks that the test for successive double jeopardy claims differs under the federal and state constitutions, the issue addressed in part III. Assuming arguendo that the test is the *Blockburger* "same evidence" test under both state and federal constitutions, the question whether a single conspiracy has been impermissibly divided into multiple conspiracies is guided by all the facts, including, but not limited to, the charges themselves and any other relevant circumstance, such as (1) the time, (2) persons acting as coconspirators, (3) the statutory offenses contained in the charges, (4) the overt acts charged by the government or any other description of the offenses charged that indicate the nature and scope of the activity that the government sought to punish in each case, and (5) places where the events alleged as part of the conspiracy took place.

> The essence of the determination is whether there is one agreement to commit two crimes, or more than one agreement, each with a separate object. [*Thomas, supra* at 662.]

---

[8] *Dixon, supra* at 704, holding that *Grady* must be overruled because *Grady*'s same-conduct test, unlike the *Blockburger* definition of what prevents two crimes from being the same offense, was inconsistent with earlier Supreme Court precedent and the clear common-law understanding of double jeopardy.

As this Court recognized in applying *Blockburger*, *People v Robideau*, 419 Mich 458, 470; 355 NW2d 592 (1984), the test is solely one of statutory construction. *Blockburger* does not apply where the Legislature intends to impose separate punishments for criminal activity. Thus, the ultimate question is whether the Legislature intended that the conviction of defendant Banks of conspiracy to distribute drugs in Muskegon precludes conviction of a conspiracy to distribute over 650 grams of drugs in Oakland, Detroit, and *outside* the state.

The majority's response to this inquiry is the statement that conspiracy to deliver 50 to 224 grams of cocaine is a lesser-included offense of conspiracy to possess with intent to deliver over 650 grams. In addition to ignoring the fact that the crime of conspiracy is the agreement to commit the illegal act, the conclusion posits that the cocaine possessed by defendant Banks in Muskegon, like the theft of the car that was the unit of prosecution in *Brown v Ohio*, 432 US 161; 97 S Ct 2221; 53 L Ed 2d 187 (1977), was the same cocaine possessed by conspirators Gerald Hill and Franklin in Southfield on July 5, 1990, and in Muskegon on July 6, 1990, by Anthony Johnson some seven months after the arrest of Banks and Wilson. Stated otherwise, if any conspiracy is an included offense of a charge of an over 650-gram conspiracy, there could never be prosecution of a separate conspiracy. It would follow that no person tried for conspiracy to possess cocaine could ever be prosecuted for a separate and larger conspiracy, a result that would frustrate, rather than effectuate, legislative intent. *People v Morris*, 450 Mich 316, 338; 537 NW2d

842 (1995);[9] MCL 333.7401(3);   MSA 14.15(7401)(3).[10]
Moreover, *People v Marji*, 180 Mich App 525, 531; 447
NW2d 835 (1989),   cited by the majority for the pro-
position that "[c]onspiracy to possess with intent to
deliver 50 to 224 grams of cocaine is a lesser included
offense of conspiracy to possess with intent to deliver
over 650 grams," *ante* at 428, actually holds:

> While delivery of lesser amounts of cocaine are crimes
> within the same category as delivery of over 225 grams of
> cocaine and share some elements with the greater offense,
> they also contain essential elements not present in the
> greater offense, namely proof of lesser quantities of con-
> trolled substances. . . . Thus these lesser offenses must be
> considered cognate offenses.

[9] In *Morris* at 320, we held that the term "another felony," as used in
§ 7401(3), includes "any felony" for which a defendant has been sentenced
either before or simultaneously with the controlled substance felony for
which a defendant is currently being sentenced. The statute thus man-
dated consecutive sentencing for another felony.

In *United States v Gonzales*, 520 US ___; 117 S Ct 1032, 1034; 137 L Ed
2d 132 (1997),   the Court, construing the following statutory language the
"sentence . . . shall [not] run concurrently with any other term of impris-
onment," determined that the meaning of "any" has an expansive meaning
not limited to federal sentences, but "any" sentences, state or federal. Fur-
ther, the Court found the statutory command prohibiting concurrent
sentences to be straightforward and unambiguous and thus rejected as
unnecessary a resort to legislative history. *Id.*, 117 S Ct 1035.

[10] MCL 333.7401(3);   MSA 14.15(7401)(3) provides:

A term of imprisonment imposed pursuant to subsection (2)(a)
or section 7403(2)(a)(i), (ii), (iii), or (iv) shall be imposed to run
consecutively with any term of imprisonment imposed for the. com-
mission of another felony. An individual subject to a mandatory
term of imprisonment under subsection (2)(a) or section
7403(2)(a)(i), (ii), (iii), or (iv) shall not be eligible for probation,
suspension of that sentence, or parole during that mandatory term,
except and only to the extent that those provisions permit proba-
tion for life, and shall not receive a reduction in that mandatory
term of imprisonment by disciplinary credits or any other type of
sentence credit reduction.

B

The Supreme Court has not set forth a clear test for determining, for . double jeopardy purposes, whether there is one conspiracy or many.[11] The Court has agreed with lower federal courts that, where the conduct is multilayered, the *Blockburger* approach is an inadequate guide in jeopardy analysis. *United States v Felix*, 503 US 378, 390; 112 S Ct 1377; 118 L Ed 2d 25 (1992).

Thus, while the United States Supreme Court has held that a substantive charge with a conspiracy charge is not barred by double jeopardy, *id.* at 389, and that conspiracy is a lesser included offense of a continuing criminal enterprise in a single indictment,[12] *Rutledge v United States*, 517 US 292; 116 S Ct 1241; 134 L Ed 2d 419 (1996), guidance on the issue of double jeopardy in multiple conspiracy situations must be drawn from decisions of the federal courts of appeal.

---

[11] Although five justices argued in *Dixon* to overrule *Grady* and return to *Blockburger*, they disagreed on application of *Blockburger* to the facts.

[12] The most recent United States Supreme Court decision, *Rutledge v United States*, 517 US 292; 116 S Ct 1241; 134 L Ed 2d 419 (1996), holds that a § 846 conspiracy count brought in addition to a § 848 continuing criminal enterprise count in a single indictment is a lesser included offense of the continuing criminal enterprise if the conspiracy agreement is based on the same underlying conduct as the "in concert" component of the continuing criminal enterprise statute. The Court noted that this case did not involve the successive-prosecution strand of the Double Jeopardy Clause and that the government may still prosecute a person for two conspiracies. Additionally, the Court observed that the government may continue to prosecute one or more conspiracies without being aware of facts that would justify charging a continuing criminal enterprise and that the conspiracy may not always be coterminous with the larger continuing criminal enterprise. *Id.*, 116 S Ct 1250, n 17.

C

The federal courts have rejected a strict *Block-burger* double jeopardy analysis in dealing with subsequent prosecutions when more than one conspiracy is at issue. The same-evidence test of *Blockburger* is of "questionable value in conspiracy double jeopardy issues." *United States v Thomas, supra* at 662. The federal circuits have developed a "totality of the circumstances" test that "provides a more accurate analysis in determining whether multiple conspiracies exist." *Id.* The following factors from *Thomas*, which we previously cited with approval in *Mezy*, are:

> (1) time, (2) persons acting as coconspirators, (3) the statutory offenses charged in the indictments, (4) the overt acts charged by the government or any other description of the offenses charged that indicate the nature and scope of the activity that the government sought to punish in each case, and (5) places where the events alleged as part of the conspiracy took place. [*Id.* at 285.][13]

---

[13] In *Mezy*, we concluded that the two conspiracies at issue were the same for double jeopardy purposes. Chief Justice BRICKLEY's evaluation of the five factors, however, *id.* at 286-287, led him to conclude that the conspiracies were not the same, but separate and distinct:

> I concur with the decision to remand even though several factors appear to suggest that the defendants were not prosecuted twice for the same act. The alleged conspiracies were separate in time, although there was an overlap of some two years. The persons involved in each conspiracy were different, although again there was some overlap. The charged offenses were the same, consisting of the conspiracy to possess cocaine with the intent to distribute it, although the amounts charged were different. The overt acts varied greatly between the indictments. The locales of the offenses also differed. Finally, the conspiracies differed in scope, with one aiming at large-scale national distribution and the other at local, street-level transactions. However, because this Court has not previously addressed the burden of proof, it is appropriate to remand to allow the trial court to apply the correct burden.

\*     \*     \*

The majority of the federal circuits employ a similar test to determine whether two charged conspiracies constitute the same offense for purposes of double jeopardy,[14] although the United States Court of Appeals for the Second Circuit adds as a factor the interdependence between the alleged conspiracies. *United States v Korfant*, 771 F2d 660, 663 (CA 2, 1985).

The first factor is time. The time frame of the two conspiracies in this case demonstrates that the smaller Muskegon conspiracy ran from December 7, 1989, through December 11, 1989, whereas the larger Oakland conspiracy ran from approximately fall, 1988, through fall, 1990. Thus, the time frame of the smaller conspiracy is subsumed by the larger.

In *Thomas, supra* at 667, the Eighth Circuit held that the fact that the conspiracies overlap in time does not prove that there was only one conspiracy, and the Seventh Circuit, in *United States v Chiattello*, 804 F2d 415, 419 (CA 7, 1986), indicated that the fact that a three-week period for one conspiracy was totally subsumed within the duration of the other was

---

[D]ouble jeopardy is not implicated by the facts before us. The lead opinion does conclude that, for double jeopardy purposes, the defendants established a prima facie claim that the prosecutions were for the same offense and that the government then failed to demonstrate that prosecution was not barred. I would conclude that the defendants did not make a prima facie showing and that a preponderance of the evidence demonstrated that the offenses were distinct. [BRICKLEY, C.J. (concurring in part and dissenting in part).]

[14] See *United States v Hart*, 933 F2d 80, 85 (CA 1, 1991); *United States v Inmon*, 594 F2d 352, 354 (CA 3, 1979); *United States v MacDougall*, 790 F2d 1135, 1144 (CA 4, 1986); *United States v Futch*, n 3 *supra* at 390-391; *United States v Evans*, 951 F2d 729, 737-739 (CA 6, 1991); *United States v Chiattello*, n 6 *supra* at 418; *United States v Mayo*, 646 F2d 369, 372 (CA 9, 1981); *United States v Sturman*, n 3 *supra* at 843.

far from sufficient to establish the existence of only one conspiracy. A situation identical to that presented in the instant case has been considered by the Second Circuit. *United States v Macchia*, 35 F3d 662, 669 (CA 2, 1994). In *Macchia*, the court recognized that "where the smaller conspiracy is charged first, there is not the same opportunity for prosecutorial abuse, and the overlap of time is therefore a less important consideration." Consequently, the time factor in the present case is not dispositive in respect to whether there was one conspiracy or two.

The second factor is consideration of the persons acting as coconspirators. In the Muskegon conspiracy, the persons charged in the information with conspiracy were Wilson and Banks, plus Franklin, who had been named as an unindicted coconspirator. Also named were accomplices Cato Peterson, a street seller for Banks, and Ronald Gardner, the designated driver for the Muskegon trip, who had been arrested along with the defendants on December 11, 1989. Both Peterson and Gardner testified for the prosecution and pleaded guilty of lesser offenses.

By comparison, the Oakland conspiracy involved many more people and many more witnesses. There were two indictments naming ten persons in the Oakland conspiracy: defendants Wilson and Banks, Gerald Hill, Terrence Moore (T-Bone), Anthony Johnson (Mark or Robert Johnson, Tone), Ricky Franklin, Kevin Jackson (Fat Kevin), Demetris Shapel (38, 30/30, Dee), Dwayne Winn (Freddy Kruger), and Martese Weidaman (M & M). The Oakland conspiracy trial included other unindicted coconspirators and numerous witnesses either unknown or not called in the Muskegon conspiracy trial. The only persons com-

mon to both conspiracies who were actually charged
with both conspiracies were Wilson and Banks.
Although Franklin was named in the information, he
was never formally charged in Muskegon. Peterson
and Gardner were not indicted in Oakland. The Mus-
kegon information indicates that Ricky Franklin was
a coconspirator; however, he was only indicted in the
Oakland conspiracy where the evidence demon-
strated that he was a major cocaine dealer and
unquestionably a central figure in the conspiracy.

The federal courts have on numerous occasions
evaluated the importance of the overlap of partici-
pants and its importance for double jeopardy pur-
poses. Where the extent of the overlap was found to
be significant in terms of participants, the court
weighed this fact with the other factors in determin-
ing if one or two conspiracies existed. For the most
part, if the overlap was not considerable, the courts
have found two conspiracies. For example, where
there were two common defendants out of sixteen in
one conspiracy, and seven in the other conspiracy,
*United States v Reiter*, 848 F2d 336, 341 (CA 2, 1988),
or twenty-two persons named in two indictments in
which only two were common to both indictments,
*United States v Futch*, 637 F2d 386, 390 (CA 5, 1981),
the conspiracies were held to be different.[15] In
*Dortch*, the Seventh Circuit held that when two out of
twenty-three charged in one indictment were subse-
quently charged in another, a common conspiracy
was not necessarily suggested, noting that a greater
overlap of participants would be expected if there

---

[15] See also *United States v Sturman*, n 3 *supra* at 843 (holding where
two out of seven in the Ohio indictment were common participants in the
Florida indictments, there was no objectionable overlap).

were really only one conspiracy. *Dortch, supra* at
1062. Conspiracies are not necessarily mutually exclu-
sive in terms of participants, thus "[o]ne individual
can certainly join more than one conspiracy to dis-
tribute drugs." *Id.* at 1063. In all these cases, the
courts found two distinct conspiracies despite the
overlap of participants. Therefore, the fact that in the
instant case three conspirators are common to both
conspiracies does not present a bar to finding two
discrete conspiracies.[16]

The third factor is an examination of the statutory
offenses charged. Because often there is only one
statute involved in multiple conspiracy cases, *United
States v Hart*, 933 F2d 80, 85 (CA 1, 1991),  and
because any drug conspiracy necessarily would come
within the purview of the federal Controlled Sub-
stance Act, similarity in the charges for both conspir-
acies would not be surprising. *United States v Henry*,
661 F2d 894, 897, n 4 (CA 5, 1981).

The *Dortch* court found reliance on the fact that
the indictments charged a violation of only one stat-
ute to be the weakest evidence of a single conspiracy
stating that " 'the guarantee against double jeopardy
does not insulate a criminal from punishment for sub-
sequent offenses merely because he chooses to con-
tinue committing the same type of crime.' " *Id.* at
1063, quoting *United States v West*, 670 F2d 675, 681
(CA 7, 1982). Because it is possible to have two dif-
ferent conspiracies violating the same statute to com-
mit the very same crime, *Thomas, supra* at 666, the
fact that defendants may have violated the same con-

---

[16] See also *United States v Booth*, n 3 *supra* at 29 (ten common defend-
ants out of nineteen), and *United States v MacDougall*, n 14 *supra* at 1145
(overlap of twelve defendants out of a total of twenty-four).

spiracy statute to deliver drugs more than one time by engaging in more than one conspiracy does not preclude a second prosecution.

The fourth and probably most significant factor[17] in analyzing successive conspiracy charges is a comparison of overt acts or any other description of the offenses charged indicating the nature and scope of the activity that the government seeks to punish in each case. The Muskegon conspiracy as related in testimony at the first trial was an agreement to sell drugs in the Muskegon projects, a "hot" market where drugs were "rolling," carried out by Banks on behalf of Franklin, which involved picking up and using Peterson and Wilson as street runners. The overt acts in that conspiracy were the trip to Muskegon from Detroit (which resulted in the arrest), the placing of cocaine in a hot plate, transporting it under the jack of the missing spare tire,[18] and some evidence that there had been previous trips, not all with these same defendants from Detroit, to the projects in Muskegon for the purpose of selling crack cocaine. There is no indication from any source of an Oakland County connection. Nor was there evidence of Banks' relationship to Terrence Moore, who had processed cocaine in Oakland County or of his connection to

---

[17] *In re Grand Jury Proceedings*, 797 F2d 1377, 1383 (CA 6, 1986).

[18] In the Muskegon cases, the trial evidence showed there were 222 grams of crack cocaine. In the jury instructions in Wilson's separate trial, the judge did not specify an amount of drugs in connection with the conspiracy charge, leaving that question to the jury. In Banks' trial, the judge included a lesser-offense charge of conspiracy to possess less than twenty-five grams. The Banks' jury convicted Banks of the lesser-included offense of conspiracy to possess less than twenty-five grams. In *Wilson*, the jury convicted him of conspiracy.

Anthony Johnson, both codefendants in the Oakland conspiracy.

The agreement in the Oakland conspiracy was also to sell drugs, but it included the purchase, processing, and sale of drugs in Oak Park and had a geographic scope extending to Ohio, Illinois, and Minnesota. Testimony in the Oakland case implicated moving amounts of cocaine well in excess of 650 grams both before and after the December, 1989, arrest of Banks. The Oakland conspiracy scheme involved purchasing large amounts of raw cocaine over time from different suppliers, "cooking" the cocaine into crack at various places in Southfield, Oak Park, and Detroit, and employing different persons other than those named in the Muskegon trial to transport and sell the cocaine. Unlike the limited Muskegon conspiracy, the extensive activities of the Franklin agreement are indicative of a far greater commercial enterprise in which Ricky Franklin was the central player and the hub of the wheel and Aaron Banks, his trusted lieutenant, was more than just one of his regional supervisors.

The federal courts consider the overlap[19] of acts as meaningful to the determination whether there are one or more conspiracies. However, not surprisingly, as the court noted in *United States v Hart, supra* at 86, while conspiracies may be "similar in nature to the extent that each involved cocaine deals, the evidence presented by six government witnesses revealed different transactions in different places

---

[19] In *Thomas, supra* at 666, the court determined that, while five overt acts overlapped, there were a sufficient number of acts not overlapping that supported separate conspiracies.

with different people."[20] Thus, the fact that Banks was in an agreement with Wilson (and with many other runners) whose object was the Muskegon market, does not negate the fact that Banks was an integral part of the much larger and more ambitious Oakland enterprise. As the court observed in *United States v O'Dell*, 462 F2d 224, 227, n 2 (CA 6, 1972):

> In the absence of any evidence that the two distinct groups worked together toward a common goal, rather than merely following parallel plans built around the central figures . . . we do not find any reason to view the two plots as part of a single unified conspiracy.

The Oakland County prosecutor presented both witness testimony and other evidence of the larger conspiracy by introducing evidence of different drug transactions, different casts of characters, different methods of operation, and use of diverse locations within the state to advance different purposes (drug purchases, processing, and sales) of the conspiracy.[21]

---

[20] "Separate chains of conspiracy may emanate from the same leadership"; thus separateness can be demonstrated by different wholesalers linking the distribution heads to the retailers at the bottom. *Reiter, supra* at 341.

One court even found it significant that the police officials involved in exposing the two conspiracies differed, *United States v Henry, supra* at 897, which is the situation presented in the present case. Muskegon police discovered the local Muskegon conspiracy while Oakland County ultimately uncovered the larger statewide conspiracy.

[21] Among other evidence of overt acts indicating that the nature and scope of the Oakland conspiracy was much larger than that encompassed by the first case, *United States v Maza*, 983 F2d 1004, 1014 (CA 11, 1993), was testimony by both Gardner and Jeremiah Perry that Banks kept money and cocaine for Franklin at his parents' house in Detroit on many occasions. Both testified that Banks had been present more than once when cocaine was processed at Terrence Moore's place in Oak Park, and Perry said Franklin had processed cocaine at Banks' home. Miss Louise testified that Banks stayed at her place all the time and spent hours on the phone to Detroit running up enormous phone bills that he paid for.

Further, any contention by Banks that he was only involved in the Muskegon operation that was terminated with his arrest in Muskegon and for which he has already been punished is refuted by the prosecution's offer of proof and testimony at the preliminary examination in the Oakland trial that, after the December 11, 1989, Muskegon arrest, Banks contacted accomplice Ronald Gardner with a request that Gardner not say anything further to police, that he should fire his lawyer, hire the same attorney that Banks had retained, and that Ricky Franklin would pay for the lawyer's services.[22]

Other indicia of Banks' continuing facilitation and involvement in the larger conspiracy is Peterson's testimony that Banks told him not to tell the Muskegon authorities that the drugs belonged to him, promising Peterson that if he did as he asked, he would put money in his account. While incarcerated, Banks continued to pay for phone calls incurred by the larger conspiracy. Miss Louise testified that after Tone went

Although she testified that she did not see Banks with drugs, she did admit that Banks had introduced her to Franklin, handled the money, and was in contact with Franklin on a regular basis. Wilson, Peterson, and Perry all said they worked for Banks and testified to a cumulatively large number of trips to Muskegon with Banks to sell cocaine. They also testified to knowing there were other runners both in Detroit and Muskegon who sold drugs for Banks. Dwayne Winn, another coconspirator, testified that Banks had recruited him to sell drugs and that he, too, had made trips to Muskegon with Banks to sell cocaine. Parenthetically, testimony regarding incidents in October and November when bricks of cocaine were "rocked up" at Terrence Moore's home in Oak Park circumstantially refutes the allegation that the Muskegon and Oakland conspiracies were one and the same.

[22] The trial court sustained an objection by defendant on the ground that the evidence related to the Gardner conspiracy, which had "ended" with Banks' arrest.

to jail following his arrest in July, 1990, Banks helped
pay off Tone's long distance phone bills.[23]

> "[F]urther [participation in an] 'old' conspiracy after
> being charged with that crime becomes a new offense for
> purposes of a double jeopardy claim." [*United States v
> Dunn*, 775 F2d 604, 607 (CA 5, 1985), quoting *Stricklin*,
> *supra* at 1121, n 2.]

In contrast to Amir Wilson, who from all that appears
was a runner, testimony in the Oakland case indi-
cated that Banks was involved in numerous overt acts
for which he was never in jeopardy in Muskegon.

The fifth factor in the totality-of-circumstances
analysis is location. The Muskegon conspiracy started
in Detroit and ended in Muskegon with an arrest for
the attempted delivery of over fifty grams of cocaine.
The location of the conspiracy in Oakland County
was Southfield and Oak Park, Detroit in Wayne
County, and Muskegon Heights in Muskegon County.
There was also testimony that Franklin obtained his
drugs from many sources and that overt acts during
the Franklin agreement involved drug sales in Grand
Rapids, Benton Harbor, Kalamazoo, and out of state
in Minnesota, Pittsburgh, Indiana, and Lima, Ohio,
and that Franklin had traveled to Chicago and other
Ohio locations to sell drugs.[24]

---

[23] An Oakland County witness, Andrew Bernard, who had been in jail
with Banks in August 1990, also testified that Banks told him that he was
in jail for selling drugs and that prosecutors were trying to trick him into
getting his "brother," Ricky Franklin, to Muskegon, thus circumstantially
indicating Banks' agreement with Franklin and continuing efforts to facili-
tate the Franklin operation and the larger conspiracy even while incarcer-
ated in Muskegon.

[24] Contrary to the assertion made by the lead opinion that only one wit-
ness testified about the marketing of drugs outside the state, *ante* at 432,

The federal circuits have not found that agreements even within closely related geographical communities are compelling evidence of a single conspiracy. In *Futch, supra* at 390, the two conspiracies occurred in six counties in the Southern District of Georgia. The conspiracies named different counties as the place where the conspiracies occurred. The court found that this factor indicated the operations were dissimilar, lending credence to the conclusion that the conspiracies were separate. The Second Circuit noted that the New York metropolitan area was certainly large enough to harbor two simultaneous narcotics conspiracies. *United States v Mallah*, 503 F2d 971, 983 (CA 2, 1974).[25] Similarly in metropolitan areas such as Pittsburgh, greater St. Louis, and Atlanta, the Third Circuit, *United States v Inmon*, 594 F2d 352, 354 (CA 3, 1979), Seventh Circuit, *Dortch, supra* at 1063, and Fifth Circuit, *United States v Henry, supra* at 897, n 4, respectively, have also stated that it was possible for more than one scheme or conspiracy to exist to distribute drugs in one metropolitan area. Although the geographic locations of both conspiracies in the instant case have a Detroit-Muskegon overlap, the breadth of the Oakland conspiracy indicates two distinct conspiracies.

---

witness Ronald Gardner also testified about the extensive geographical scope of the conspiracy.

[25] See also *United States v Macchia, supra* at 671 (finding the New York-New Jersey metropolitan area large enough to harbor two conspiracies dealing in bootleg gasoline) and *United States v Papa*, 533 F2d 815, 819-820 (CA 2, 1976) (finding that there is no geographic overlap where one narcotics conspiracy occurred in Long Island and several locations in the Bronx, and the other occurred in Astoria, Queens, and another location in the Bronx).

In summary, a proper review under federal standards relevant to a double jeopardy claim regarding successive conspiracies supports the position that there were two separate and distinct conspiracies.

> The dissimilarity of persons, places and modes of operation does not show an unbroken or repetitive pattern . . . [and] [m]ost of the seeming similarities represent those factors which would be common to separate conspiracies carried out in a similar manner. [*Futch, supra* at 391.]

Banks was a major player in the Oakland conspiracy who continued to pursue its criminal objectives even after his arrest.

## III

Assuming that the defendant's conviction for the Oakland conspiracy was not the same offense as the agreement in Muskegon, under the federal test, the question is, as the parties recognize, whether *People v White, supra,* bars the second prosecution of Banks under the Michigan interpretation of double jeopardy protection in the context of successive prosecutions.

### PEOPLE v WHITE

Before 1973, this Court defined the scope of protection of double jeopardy consistent with federal law. *People v Grimmett,* 388 Mich 590; 202 NW2d 278 (1972). *Grimmett* was overruled and the "same transaction" test was adopted in *People v White, supra* at 258. That decision came, despite this Court's rejection of the test in *Grimmett,*[26] which noted the difficulty

---

[26] The Court noted the defendant's contention that multiple prosecutions should be prohibited when arising out of the same factual situation. In some cases multiple prosecutions are prejudicial to a defendant and in

of imposing a mandatory rule requiring the application of the "same transaction" test[27] in all double jeopardy cases. *Id.*

The "same transaction" approach requires the government to join at one trial all the charges against a defendant that grow out of a continuous time sequence and display a single intent and goal. *People v Sturgis*, 427 Mich 392, 401; 397 NW2d 783 (1986). The test is said to " 'promote the best interests of justice and sound judicial administration'. . . ." *Id.* at 402. In *White* itself, for example, the crimes committed, kidnapping, felonious assault, and rape, were all part of a single criminal episode committed in a continuous time sequence and displaying a single intent and goal. The Court limited its holding to similar factual situations and indicated its willingness to consider the adoption of limited exceptions to the test.

Within three years of the decision in *White*, the difficulty of applying the test observed in *Grimmett* had produced a practice of pleading guilty to the least serious of offenses growing out of a single transaction and seeking preclusion of the more serious charges. In a series of cases, *Crampton v 54-A District Judge, supra* at 500, the Court granted bypass to revisit *White*.

---

some cases may aid a defendant. The Court concluded that a mandatory rule would be an unwise solution to this problem and suggested that this type of rule is properly a decision for the Legislature and not this Court. *Grimmett, supra* at 607.

[27] This test was advocated by Justice William Brennan in his concurring opinion in *Ashe v Swenson*, 397 US 436, 448; 90 S Ct 1189; 25 L Ed 2d 469 (1970). It has been consistently rejected on numerous occasions by the United States Supreme Court despite Justice Brennan's efforts to the contrary. See *Brown v Ohio, supra, Garrett v United States*, 471 US 773, 790; 105 S Ct 2407; 85 L Ed 2d 764 (1985), *United States v Felix, supra* at 391, and *United States v Dixon, supra* at 711.

The majority developed a two-part exception to the same-transaction test based on whether the crimes involved were intent or no-intent crimes:

> (1) Where criminal intent is required in the offenses involved, the criterion set forth in *White* applies: "continuous time sequence and display [of] a single intent and goal."
>
> (2) Where one or more of the offenses does not involve criminal intent, the criterion is whether the offenses are part of the same criminal episode, and whether the offenses involve laws intended to prevent the same or similar harm or evil, not a substantially different, or a very different kind of, harm or evil. [*Id.* at 501-502.]

Thus, applying the rationale of the *Crampton* majority to the instant case, the instant conspiracies do not involve both a continuous time sequence and display of a single intent and goal. *Id.* at 502. *White* is therefore inapplicable and the Oakland prosecution was not barred.

Agreeing that *White* was inapplicable, Justice LEVIN concurred, but adopted a different rationale for the result, which also emphasized the limits of the same-transaction test and the potential for anomalous results. *Crampton, supra* at 511. While carefully preserving the myriad situations not covered by the groups of offenses he delineated, *id.* at 516, Justice LEVIN stated:

> Jones' arrest for being in a blind pig was but the occasion for discovering his possession of heroin and marijuana; it does not appear that Jones acquired the heroin or marijuana in the blind pig. There is no substantial connection in criminality between offenses where the only factor connecting one offense with the other is that one was discovered in consequence of apprehension for the other; each is a separate transaction.

Thus, from the perspective of either the majority or concurrence in *Crampton*, that is, that the two crimes did not involve a continuous time sequence or common intent, or that the second conspiracy was discovered in consequence of the first, the Muskegon and Oakland conspiracies are not the same transaction.

IV

DUE DILIGENCE

Assuming that the Muskegon conspiracy was a lesser included offense of the Oakland conspiracy, or that the same-transaction test of *White* applies, the due diligence exception permits the prosecution of Aaron Banks in Oakland County. "The Double Jeopardy Clause does not preclude bringing in a second action any charge which *might* have been brought in the first action. Rather, it only precludes those which *must* have been brought in the first or be forever lost. The due diligence doctrine provides an exception in this latter situation. Thus, it follows, that if the government need not have brought all of its charges in the first action, there was nothing for it to be diligent about." *United States v Maza*, 983 F2d 1004, 1008 (CA 11, 1993) (emphasis in the original). Because the Oakland conspiracy was not discovered until after the arrest of Wilson and Banks, due diligence permits prosecution of Banks for the Franklin conspiracy.

> [W]here the state had made a diligent and good faith effort to protect the defendant's constitutional rights . . . "[f]or example, where a crime is not completed or not discovered, despite diligence on the part of the police, until after the commencement of a prosecution for other crimes arising from the same transaction, an exception to the 'same transaction' rule should be made to permit a separate prosecution." *Ashe v Swenson*, 397 US 436, 453, n 7; 90 S Ct

1189; 25 L Ed 2d 469 (1970)  (Brennan, J., concurring). [*White, supra* at 258, n 6.]

Due diligence is an exception to the prohibition against double jeopardy under both state and federal law. The exception is applicable to the federal multiple prosecution strand of double jeopardy, *Brown v Ohio, supra* at 168, to Justice Brennan's same-transaction test, *Ashe v Swenson, supra* at 453, and to Michigan's same-transaction test as formulated in *People v White, supra* at 258, n 6.

The federal courts have had occasion to discuss due diligence in several cases. "Due diligence means ordinary, rather than extraordinary, diligence, and it is within the discretion of the trial judge to determine the diligence required under the circumstance." *United States v Walker*, 546 F Supp 805, 811 (D Hawaii, 1982)  (citations omitted). Diligence is a question of fact, and findings of fact by the trial court will be sustained unless clearly erroneous. *United States v Stearns*, 707 F2d 391, 392 (CA 9, 1983). In the instant case, the facts concerning the greater conspiracy became known only after the first trial had begun. For example, although in Muskegon Ronald Gardner identified Ricky Franklin as the source of the drugs, he did not involve Terrence Moore or admit to his presence when Moore "cooked rocks" in Oak Park. Gardner did not identify for the Muskegon authorities the other players and locations he later testified about in Oakland, nor did he make clear Banks' extensive involvement with Anthony Johnson. Most importantly, because both Peterson and Gardner minimized their involvement, there was no indication at any time that Oakland County had any relationship to the spot runs to Muskegon and no indication of the

prolonged cooperation of Banks with the higher eche-
lons of the Oakland conspiracy. The Oakland County
Grand Jury investigation was precipitated by the dis-
covery of cocaine on July 5, 1990, behind the Hi-Lo
Auto Parts store in Southfield and the subsequent
arrest of codefendant Gerald Hill. The investigation
occurred after the conviction of defendants Wilson
and Banks and witness accomplices Peterson and
Gardner, in early June, 1990. It was not until August,
1990, that Officer Quisenberry and an Oakland
County prosecutor met with the Muskegon County
prosecutor to exchange information about names that
had surfaced in connection with the recent Oakland
County investigation. It was not until after this date
that Gardner and Peterson revealed their more exten-
sive roles in the conspiracy and allegedly decided to
cooperate fully.

Further, while the majority states that both pros-
ecutions were conducted by the same sovereign it
does not tell us what jurisdiction the Muskegon
authorities, two hundred miles away, would have had
to investigate suspected drug activities in Wayne
County or that they were even aware of an Oakland
County connection, given that all those arrested were
from Detroit. It does not appear that the Muskegon
authorities had a correct address for Franklin to enter
into the LEIN system, nor did they have any evidence
of any overt act linking Franklin to Oakland County.[28]
Although the Muskegon authorities knew that the

---

[28] At the Muskegon trial, Gardner testified that Franklin lived in Dear-
born at Warren and Telegraph; however, Franklin had moved in December
1989, to Southfield and had his phone number installed under the alias of
Stephen Griffin. Franklin took pains to hide all his activities, buying drugs
and processing them in Detroit, but not selling them in Detroit. He moved
his processing operation to different locations in Oakland County and,

Muskegon Heights housing projects were being flooded with drugs they did not know the true scope of the larger conspiracy until after Oakland County started its investigation in July 1990, well past the Muskegon trial date.

In short, the Muskegon authorities did not have sufficient information to charge and prove that, from 1988 to 1990, Franklin and others conspired in "the County of Oakland" to possess with intent to deliver in excess of 650 grams. There is nothing to suggest that Muskegon had any reliable information about the scope of Franklin's activities beyond the mere statements of Wilson, Gardner, and Peterson. Thus, even if it were correct to assume that the knowledge of the Muskegon authorities could be imputed "to the Oakland County authorities," *ante* at 438, the Oakland authorities would have had no knowledge of an Oakland connection.[29]

---

when his Muskegon base of operation at Miss Louise's house was threatened, moved quickly to another Muskegon location.

Franklin, as well as many of the coconspirators, had street names and other aliases. Franklin's street name was Tiger, and he had used the name of Kevin Moore on an occasion when he was stopped by Detroit police for a traffic violation. Franklin also tried to purchase Gardner's driver's license for $1500 to use this as another identity. Just before the Oakland County trial, investigators had learned that Franklin had a driver's license in the name of Tony Young and had used that name to rent warehouse space. Additionally, all the rental cars that were used to transport the drugs or scout new locations were not rented by Franklin, but by Jodel Moore, Eulia Mae Perry, and others, although the alias Tony Young was sometimes put on the contract as an additional driver.

[29] This assertion, made without any precedential support, is the most remarkable statement by the majority and one which would completely obviate the inquiry regarding whether the Legislature intended cumulative punishment, *Albernaz v United States*, 450 US 333; 101 S Ct 1137; 67 L Ed 2d 275 (1981), and the holding in *Crampton, supra.*

Contrary to the majority's position, *ante* at 438, *Waller v Florida*, 397 US 387, 392; 90 S Ct 1184; 25 L Ed 2d 435 (1970), does not provide that the knowledge obtained in an investigation by authorities in one county is

By the June 1990 trial date, the Muskegon authorities knew something about Miss Louise, knew about the use of rental cars, had some knowledge that spare tires were used to transport drugs, and thought they knew that Rick Franklin lived in Dearborn. In light of the charged defendants constitutional rights to a speedy trial[30] and the statutory requirement, MCL 780.131; MSA 28.969(1),[31] to be brought to trial within 180 days of the issuance of a warrant, indictment, or information, the Muskegon authorities proceeded to trial against Wilson and Banks on the basis of the admissible evidence available to them at the time.

Other than the conclusory statement that Gardner and Peterson were willing to fully aid the investigation, an assertion belied by their trial testimony in Muskegon, the majority does not suggest how the

---

imputed to those in another county. *Waller* holds that a defendant may not be tried both by a municipality and the state government for the same offense. *Id.* at 395.

[30] US Const, Am VI,  and Const 1963, art 1, § 20.

[31] MCL 780.131(1);  MSA 28.969(1)(1)  provides in part:

Whenever the department of corrections receives notice that there is pending in this state any untried warrant, indictment, information, or complaint setting forth against any inmate of a correctional facility of this state a criminal offense for which a prison sentence might be imposed upon conviction, the inmate shall be brought to trial within 180 days after the department of corrections causes to be delivered to the prosecuting attorney of the county in which the warrant, indictment, information, or complaint is pending written notice of the place of imprisonment of the inmate and a request for final disposition of the warrant, indictment, information, or complaint. The request shall be accompanied by a statement setting forth the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time or disciplinary credits earned, the time of parole eligibility of the prisoner, and any decisions of the parole board relating to the prisoner. The written notice and statement shall be delivered by certified mail.

authorities should have proceeded to develop an Oakland case, or how Banks' and Wilson's rights could have been accommodated while the authorities investigated Franklin. The knowledge of the Muskegon authorities cannot be imputed to the Oakland authorities because they had no knowledge of activity in Oakland.

*United States v Tolliver*, 61 F3d 1189, 1211 (CA 5, 1995), is applicable to the present case. In *Tolliver*, the court considered the fact that the government might have suspected that defendant Elwood was part of the larger conspiracy, but it was not until later that evidence demonstrating his considerable involvement came to light.[32] Therefore, "[w]hat appeared on the surface to be a discrete drug transaction—based on the facts reasonably available to the government at the time—turned out to be part of a much larger conspiracy [and] Elwood, whose initial role appeared small, turned out to be a major character in the overall scheme."[33]

The same situation is true here. Banks' role as a major player in the larger conspiracy, and the man responsible for keeping crack in his house before

---

[32] In *Tolliver* at 1211, n 37, the court emphasized that if the government suspects a defendant is involved in a larger conspiracy, it would be well advised to indict him first on the substantive offense and wait to indict later on the broad conspiracy when the facts are fully developed. Supreme Court holdings readily support this instruction. See *Felix, supra* at 391 (the substantive crime and conspiracy are not the same offense for purposes of double jeopardy); *Garrett v United States*, n 27 *supra* (separate punishments are allowed for a predicate offense and a continuing criminal enterprise offense).

[33] See also *Maza, supra* at 1014. In two other conspiracy cases, the government obtained evidence of other acts, the nature and scope of which were more extensive than those from the previous prosecution. Additionally, codefendants gave testimony indicating that Maza was involved in a larger conspiracy than the one he had pleaded.

transport to the selling locations and for bringing "home" the money, was not discovered until the accomplice witnesses fully informed the government after the first trial the extent of their own and others' involvement in the larger conspiracy, the use of Oakland County locations, and the identity of other witnesses, who were subsequently located and testified. See *Tolliver, supra* at 1211. As in *United States v Lacey*, 983 F2d 1070; 1993 WL 1292 (CA 6, 1993), unpublished opinion per curiam aff'g *United States v Lacey*, 782 F Supp 66 (ED Mich, 1992), the due diligence exception was appropriately employed because "a brief review of the facts relating to the . . . conspiracy shows just how complicated the conspiracy was as well as the significant amount of effort required by the government in unraveling the conspiracy." *Id.* at **8.

V

I would affirm the decision of the Court of Appeals with regard to defendant Aaron Banks and reverse the conviction of Amir Wilson.

Riley, J., concurred with Boyle, J.

Weaver and Kelly, JJ., took no part in the decision of these cases.