UNITED STATES of America, Appellee,

v.

Carl Wesley THOMAS, Appellant,

UNITED STATES of America, Appellee,

v.

Carl Angelo DeLUNA, Appellant,

UNITED STATES of America, Appellee,

v.

Anthony CHIAVOLA, Sr., Appellant.

Nos. 84–2285, 84–2286, 84–2287.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 16, 1985.

Decided April 11, 1985.

Rehearing and Rehearing En Banc
Denied May 30, 1985.

David W. Russell, Kansas City, Mo., Oscar B. Goodman, Las Vegas, Nev. and Ronald E. Partee, Kansas City, Mo., Ephraim Margolin, San Francisco, Cal., for appellants.

Edward D. Holmes, Kansas City, Mo., for appellee.

Before BRIGHT, ARNOLD, and BOWMAN, Circuit Judges.

ARNOLD, Circuit Judge.

This is an interlocutory appeal from the order of the District Court[1] denying defendants' motion to dismiss an indictment returned against them. Appellants argue that the indictment is barred by the Double Jeopardy Clause of the Fifth Amendment. We hold that the charges alleged in the indictment are not the "same offence" as charges on which defendants had previously been tried, and therefore affirm the judgment.

**I.**

From May 25, 1978, through 1980, the Federal Bureau of Investigation conducted a series of electronic surveillances to investigate hidden interests by organized crime groups in one or more Las Vegas casinos.[2]

---

1. The Hon. Joseph E. Stevens, Jr., United States District Court Judge for the Western and Eastern Districts of Missouri.

2. The organized crime groups in Kansas City, Missouri, Chicago, Illinois, Milwaukee, Wisconsin, and Cleveland, Ohio, will be referred to as "Kansas City," "Chicago," "Milwaukee," and

"Cleveland." The various defendants mentioned in the two indictments are generally associated with the organized crime group located in the city where they reside, with the exception of defendants who reside in Las Vegas. DeLuna, C. Civella, N. Civella (now deceased), and Tamburello all reside in or near Kansas City, Mis-

The initial investigation soon focused on two objects, apparent hidden interests in the Tropicana Hotel and Country Club (Tropicana) casino and in the Argent Corporation (Argent), which owned four casinos, the Stardust, Fremont, Marina, and Hacienda.

On September 30, 1983, a federal grand jury in the Western District of Missouri handed up the Argent indictment, and appellants and twelve other people were indicted. The Argent indictment charges appellants and the others with conspiracy, under 18 U.S.C. § 371 (1982), to travel interstate for the promotion of unlawful activity, in violation of 18 U.S.C. § 1952 (1982). Various other substantive counts were also charged. The conspiracy is alleged to have existed approximately between January 1974 and September 1983, and involved primarily the Fremont and Stardust casinos. The gist of the alleged conspiracy by the Kansas City, Chicago, Milwaukee, and Cleveland organized crime groups and others was to obtain and maintain a hidden interest in casinos owned by Allen Glick, and to skim money from them.

Prior to the Argent indictment, appellants and eight others had been indicted on November 5, 1981, by the same federal grand jury. The earlier indictment related to the Tropicana and charged appellants and the others with conspiracy, under 18 U.S.C. § 371 (1982), to travel interstate for the promotion of unlawful activity, a violation of 18 U.S.C. § 1952 (1982), and to transport interstate stolen money, a violation of 18 U.S.C. § 2314 (1982). Various other substantive counts were also charged. The conspiracy existed approximately between January 1975 and April 1979. The gist of this conspiracy by the Kansas City organized crime group and others was to obtain and maintain a hidden

interest in the Tropicana casino, and to skim money from the casino. The appellants and all but one of the other defendants were convicted on the conspiracy charge and one or more substantive counts.[3]

Prior to trial in the present case appellants moved to dismiss the entire indictment on the grounds of double jeopardy. They claim the Argent indictment is based on the same conspiracy tried in the Tropicana trial. The District Court held appellants' claim was nonfrivolous and had a four day double-jeopardy hearing. At the hearing the burden of proof was placed on the government to show, by a preponderance of the evidence, that the conspiracies alleged in the two indictments were in fact separate. After reviewing evidence adduced at the hearing and the Tropicana trial, and the proffer of evidence the government expects to prove in the Argent trial, the District Court held the two conspiracies were separate and distinct and denied appellants' motion. Appellants then appealed to this Court. We affirm.

## II.

The Double Jeopardy Clause of the Fifth Amendment prohibits the subdivision of a single criminal conspiracy into multiple violations of one conspiracy statute. *Braverman v. United States*, 317 U.S. 49, 52–53, 63 S.Ct. 99, 101–102, 87 L.Ed. 23 (1942). The traditional test used to determine whether indictments charge the same offense is the *Blockburger* "same evidence" test. See *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). Under this test the "offenses are deemed identical for purposes of the double jeopardy clause where the evidence required to support conviction on one of the

souri. Chiavola, Sr., lives in Chicago but is more closely associated with the Civellas, his uncles. Aiuppa, Cerone, Lombardo, and LaPietra all reside in or near Chicago, Illinois. Frank Balistrieri, John Balistrieri, and Joseph Balistrieri all reside in or near Milwaukee, Wisconsin. Rockman resides in or near Cleveland, Ohio.

3. The convictions have been appealed to this Court. *United States v. DeLuna*, Nos. 83–2408, 83–2409, 83–2410, 83–2462, 83–2411, 84–1047 (8th Cir. argued Sept. 10, 1984). The outcome of this appeal is irrelevant for present purposes. It is former jeopardy, not former conviction, that will bar a subsequent prosecution, and defendants were placed in jeopardy when the Tropicana jury was impaneled.

**662**

prosecutions is sufficient to support conviction on the other prosecution." *United States v. Sinito*, 723 F.2d 1250, 1256 (6th Cir.1983), *cert. denied,* — U.S. —, 105 S.Ct. 86, 83 L.Ed.2d 33 (1984). However, the "same evidence" test is of questionable value in conspiracy double-jeopardy issues. If the "same evidence" test is the sole standard used to determine whether multiple conspiracies exist, then prosecutors could drawn up two indictments and by skillfully choosing different sets of overt acts make one conspiracy appear to be two.

■ Application of the *Blockburger* test to the two indictments before us would lead to the conclusion that two separate conspiracies exist. Since both indictments charge different overt acts, acts regarding the Tropicana operation in one and the Argent operation in the other, the evidence required to prove these acts is different. Many courts, including this Court, have determined that a "totality of the circumstances" test[4] provides a more accurate analysis in determining whether multiple conspiracies exist. See *United States v. Tercero*, 580 F.2d 312, 315 (8th Cir.1978). The following factors are normally considered in determining whether one or two conspiracies are involved: (1) time; (2) persons acting as co-conspirators; (3) the statutory offenses charged in the indictments; (4) the overt acts charged by the government or any other description of the offenses charged which indicate the nature and the scope of the activity which the government sought to punish in each case; and (5) places where the events alleged as part of the conspiracy took place. *Id.* at 314; *Sinito*, 723 F.2d at 1256. These factors are guidelines only. The essence of the determination is whether there is one agreement to commit two crimes, or more than one agreement, each with a separate object.

We will therefore look beyond the indictments and consider all the evidence we have before us. This includes evidence adduced at the previous trial, evidence expected to be presented at the second trial, and information developed at the evidentiary hearing conducted on the double-jeopardy issue. We accept the government's proffer of what it intends to prove at the Argent trial as true for the purpose of this appeal, because appellants have raised no real question about whether the government will in fact be able to produce such evidence. (Whether it will be credible, whether, that is, it will show that appellants and other defendants did what they are accused of, will of course be for the jury at the Argent trial.)

■ When appellants showed a non-frivolous claim of double jeopardy, the burden shifted to the government to show, by the preponderance of the evidence, that two separate conspiracies are charged. *Tercero*, 580 F.2d at 315 n. 12; *United States v. Bendis*, 681 F.2d 561, 566 (9th Cir.1981), *cert. denied*, 459 U.S. 973, 103 S.Ct. 306, 74 L.Ed.2d 286 (1982). In *Tercero*, 580 F.2d at 314, we found it unnecessary to decide whether the standard of appellate review in such cases is governed by the clearly-erroneous rule or is do novo. We now hold that findings of fact made by the District Court (e.g., the credibility of witnesses or disputed questions of historical fact arising at the evidentiary hearing on double jeopardy) are not to be set aside unless clearly erroneous. The ultimate question, which involves comparing the Tropicana indictment and the proof offered at the first trial with the Argent indictment and the proof to be offered at the second trial, is an issue of law on which we must make up our own minds independently.[5]

### III.

### A.

■ The evidence produced at the Tropicana trial and at the double-jeopardy hear-

---

4. We use this phrase, which has become familiar to lawyers and judges, with apologies to the English language. What it really means is "all the facts." That is, we consider not only the indictments themselves but also anything else that seems relevant.

5. See also *United States v. Beachner Construction Co.*, 729 F.2d 1278, 1281 (10th Cir.1984); *United States v. Bendis*, 681 F.2d 561, 566 (9th Cir.1981), *cert. denied*, 459 U.S. 973, 103 S.Ct. 306, 74 L.Ed.2d 286 (1982); *United States v. Jabara*, 644 F.2d 574, 577 (6th Cir.1981).

ing tends to establish the following facts in regard to the Tropicana conspiracy. Appellants and seven others, Carl James Civella, Nick Civella, Charles David Moretina, Carl Caruso, Billy Clinton Caldwell, Donald Joe Shepard, and Joseph Vincent Agosto conspired to obtain and maintain a hidden interest in the gaming operations of the Tropicana in violation of Nevada law, and to steal money skimmed from the casino.

Before the trial began, Caruso, Shepard, Caldwell, and Agosto pleaded guilty. Agosto became a lead witness for the government. Nick Civella died before trial began. Another defendant, Peter Joseph Tamburello, was found innocent. The remaining five defendants were found guilty of the conspiracy and one or more substantive counts. While evidence at the Tropicana trial clearly established that Joseph Aiuppa and John Cerone of Chicago received money from the Tropicana, they were not named in the indictment. The government argues that there was insufficient evidence to prosecute them successfully, and they were, therefore, not indicted.

In 1975 Agosto, the owner of a floorshow at the Tropicana, sought the assistance of N. Civella, C. Civella, and DeLuna to help him consolidate his interest in the Tropicana casino and to protect him from outside interference. It was agreed that Agosto should infiltrate the Tropicana, with Kansas City's support and assistance, for the purpose of stealing from the Tropicana. DeLuna and the Civellas told Agosto they would ensure that a loan application by Deil Gustafson on behalf of the Doumani brothers would be disapproved by the Central States Pension Fund (CSPF), thus facilitating Agosto's takeover of the casino. The loan was not granted, and Agosto was able to infiltrate the Tropicana and acquire. great influence in its management and operations.

N. Civella instructed Agosto to keep in touch with DeLuna concerning his progress and recommended that Thomas be hired to follow up on the skimming. Thomas was. in charge of the crew which stole money at the Tropicana, and at one point, when other

"unauthorized" skimming by the crew was suspected, wrote a report for N. Civella regarding the financial status of the Tropicana. Mitzi Briggs, the majority owner of the corporation that owned the Tropicana, never knew that stealing was taking place. In April 1978 the skimming began at the Tropicana and continued until February 1979. This was accomplished by presenting fraudulent fill slips to the cashier, causing chips to be issued. The chips would be secretly. passed to "patrons," who would then cash them. Agosto gave the skimmed money to Caruso, who then transported the money to Kansas City. From June through October of 1978, $40,000 a month was sent to Kansas City. Money was then distributed to the defendants and two individuals in Chicago, Aiuppa and Cerone.

Evidence regarding the financial transactions and various meetings between Kansas City and Chicago was provided at the Tropicana trial through detailed records seized from the home of DeLuna. Extensive evidence was also obtained through electronic surveillance, and Agosto, as the government's major witness, provided testimony regarding his involvement and that of the other defendants.

One of the major disputes at the double-jeopardy hearing, and the only factual dispute, concerned the interest that Chicago, Milwaukee, and Cleveland had in the Tropicana operation. If the appellants could show that Milwaukee, Cleveland, and particularly Chicago had an interest in the Tropicana operation, their argument that only one conspiracy existed would be strengthened. The government argued these organized crime groups were not involved in the Tropicana case. Because Chicago, Milwaukee, and Cleveland defendants were not indicted by name in the Tropicana case, evidence was not brought out regarding these issues. (There are a few limited exceptions where the evidence was introduced for other purposes.) Nor will evidence be brought out concerning these issues in the Argent trial, because they are irrelevant to the acts charged.

The appellants do not dispute that Kansas City controlled the unlawful operation at the Tropicana, but they argue that Chicago also had an interest. They point out that the Tropicana trial clearly established that Aiuppa and Cerone received money from the Tropicana, and that DeLuna's notes indicate that if Chicago owed money to Kansas City the distributions would be set off and no actual transporting of money would take place.

The appellants allege that Chicago not only received money but also shared an ownership interest. They argue that Chicago, as well as Kansas City, exercised influence over the CSPF and assisted in blocking the Doumanis' loan and thereby acquired an interest in the Tropicana in return. (Because the Doumanis' application for a loan was not approved, Agosto was able to influence and control the Tropicana's management and operations.) The appellants argue that Chicago, in order to protect and maintain its interest in the Tropicana, would have the Argent casinos provide assistance in various ways such as authorizing cash loans from the Argent Corporation to the Tropicana. This, they argue, shows the interdependence of Chicago and Kansas City in regard to the operation at the Tropicana.

Appellants further argue that Milwaukee and Cleveland also received a portion of the money skimmed from the Tropicana. The appellants rely on evidence that DeLuna distributed Argent money to Cleveland, and since his bookkeeping commingled funds at times the government cannot prove that Tropicana money did not go to Cleveland. Although there is no evidence that Cleveland and Milwaukee did receive money from the Tropicana, the appellants point out that there is also no evidence that they did not.

Although the District Court did not specifically address these issues, it implicitly found that Chicago was not involved in denying the Doumanis' application for a loan, and that Chicago did not have an ownership interest in the Tropicana. We also believe it is implicit in the District Court's opinion that it found that Milwaukee and Cleveland did not receive any money from the Tropicana operation. After thoroughly reviewing the record we do not believe the District Court's findings were clearly erroneous. There is little, if any, evidence to support the appellants' arguments. Chicago did receive some portion of the money skimmed, but it does not necessarily follow that Chicago had a hidden ownership interest in the Tropicana. There is no evidence that Aiuppa, Cerone, or other persons from Chicago ever exercised or attempted to exercise any influence over Agosto in his management of the Tropicana.

Appellants argue that Chicago and Kansas City were inter-dependent because they worked together on loans, but the testimony regarding this issue does not support their argument. At the trial Agosto testified that he would at times have other casinos, in which N. Civella had influence, cash checks for the Tropicana when the casino cage cash flow was low. This cashing of checks was referred to as "loans." The evidence thus indicated that it was Kansas City, not Chicago, which protected its interest in the Tropicana by having other casinos in which it had influence, not limited to Argent, provide cash when needed. Furthermore, we find no evidence that Milwaukee and Cleveland received Tropicana funds, and no evidence of any reason why they should have an interest in the Tropicana.

In regard to these factual disputes, we uphold the District Court's implicit finding that Milwaukee, Cleveland, and Chicago had no ownership interest in the Tropicana operation. The Tropicana, then, was a Kansas City operation in which Chicago played at most a secondary role.

### B.

The government's proffer of what it will prove at the Argent trial presents the following contentions. The appellants and Carl Civella, Peter Joseph Tamburello, Frank Balistrieri, John Balistrieri, and Joseph Balistrieri, Milton John Rockman, An-

thony Spilotro, Joseph Lombardo, Angelo LaPietra, and Anthony Chiavola, Jr., Joseph John Aiuppa, and John Phillip Cerone conspired to obtain and maintain a hidden interest in the Argent casinos, owned by Allen Glick, and to skim money from the casinos. Allen Dorfman, Nick Civella, Joseph Agosto, and James Torello are alleged to be co-conspirators in the conspiracy but died before the return of the judgment. Of the five defendants convicted in Tropicana and now charged in Argent, two have pleaded guilty, Tamburello and C. Civella, and three, DeLuna, Thomas, and Chiavola, Sr., have moved to dismiss the indictment, alleging that the second prosecution is barred by the constitutional prohibition against double jeopardy.

Glick's gaming establishments, including the Stardust and Fremont casinos, were operating pursuant to licenses issued by the Nevada Gaming Commission. The Argent defendants, however, were not licensed by the Nevada gaming authorities. The defendants acquired and maintained an undisclosed interest in the gaming interest of Glick without the knowledge and approval of the Nevada gaming Commission and other authorities.

The illegal agreement in the Argent case, the government says, came into existence in early 1974 when Frank, John, and Joseph Balistrieri made an agreement with Glick to use their influence over trustees of the CSPF to obtain financing for Glick's purchase of Recrion Corporation, which later became the Argent Corporation, in exchange for an undisclosed interest in the Argent Corporation. Essentially, Glick entered into an option contract with the Balistrieris, whereby the Balistrieris obtained a 50% interest in the Argent Corporation for $25,000, an extremely low cost, for enabling Glick to secure a $62 million loan from the CSPF.

The Balistrieris sought the assistance of Cleveland, Chicago, and Kansas City, each of which had influence over certain trustees of the CSPF, in return for a share of the skim. Since one trustee could block the loan, the unanimous approval of these organized crime groups was essential. Control of the CSPF was an essential part of the Argent scheme. Glick thus became a front who obtained his position by buying the Argent casinos with CSPF money and then represented the interests of individuals from the four cities in those casinos.

Money removed from Argent casinos was usually transported directly to Chicago, from which a portion later went to Kansas City, Milwaukee, and to Cleveland. Some money went directly from Las Vegas to Milwaukee. Skimming began as early as November 1976. Frank Rosenthal was an Argent executive who ran the casinos and represented the interests of Chicago, Milwaukee, Cleveland, and Kansas City.

The Stardust and Fremont Casinos, where the skimming took place, were dealt with primarily by Chicago in conjunction with Milwaukee. The greater share of profits went to the city which had secured the hidden interest. In the Tropicana that was Kansas City, and in the Stardust and Fremont it was Chicago.

The conspiracy existed between about January 1974 and September 30, 1983. It continued beyond the sale of the Argent Corporation by Glick in 1979, because the co-conspirators had a continued interest in the proceeds of the sale. While the Argent Corporation was not a licensee after 1979, the Argent Corporation did exist after that date. The Argent Corporation owned a mortgage on the casinos after the sale, and Kansas City had a right to share in the proceeds of the continuing payments made by the successor licensee to Glick.

Money was skimmed from the Argent casinos by numerous other methods in addition to the fraudulent-fill-slip method (which was the only method used at the Tropicana). These methods included stealing coins from the slot department, converting them into bills and physically stealing the bills as opposed to the coins, and direct theft from the counting boxes.

The government collected considerably more information regarding the Argent case after the Tropicana indictment was returned.

### IV.

Against this factual background, we now analyze the relevant factors. The first factor to consider is time. The Tropicana indictment alleges that the conspiracy began in January 1975 and continued approximately through April 1979. The Argent indictment alleges the conspiracy began in January 1974 and continued through about September 1983. The Tropicana time span is entirely included within the Argent time span. The evidence tends to show that money was actually skimmed from the Tropicana from April 1978 through February 1979 and at the Argent casinos from November 1976 through 1979.

The evidence seems clear that the Argent operation began in 1974 when Glick made a deal with the Balistrieris in Milwaukee. In return for assistance in obtaining the $62 million loan from the CSPF, Glick gave the Balistrieris a 50% option contract on his interest in the Argent Corporation. The Balistrieris in turn sought the assistance of Chicago, Kansas City, and Cleveland to obtain the loan. In contrast, the evidence from the Tropicana trial makes it clear that this operation began in 1975 when Agosto, who already worked at the Tropicana, made a deal with the Civellas and DeLuna that in return for their support in keeping out other influences, and thus consolidating his control, he would help them skim money from the Tropicana. Agosto himself so testified.

The second factor to consider is the identity of the alleged co-conspirators. There is an overlap of co-conspirators in the two indictments. Kansas City was involved in both operations. Although Aiuppa and Cerone were not mentioned in the Tropicana indictment by name, they received a portion of the money skimmed. There is no evidence, however, that Chicago had any influence in management decisions at the Tropicana, that they gave any orders to Agosto, or that they had any control or influence over the skimming operation.

The central figures in each case are somewhat different. The key people in the Tropicana operation were Agosto, N. Civella, C. Civella, and DeLuna. Chiavola, Sr. had a minor role. In the Argent operation the key people appear to be the Balistrieris, Aiuppa, Cerone, C. Civella, DeLuna, Rockman, and Chiavola, Sr. N. Civella (now deceased) and Glick (not indicted) also had major roles. Agosto's role at Argent appears to be minor, and the Balistrieris and Rockman have very little, if any, role, at Tropicana. Thomas appears to have the same position in both the Tropicana and Argent operations. He had no decision-making power, but there is evidence that he devised the actual skimming process.

The third factor is the specific offenses charged. Both indictments are brought under the general conspiracy statute, 18 U.S.C. § 371 (1982), and the Travel Act, 18 U.S.C. § 1952 (1982). Although the end purpose was to skim money from the casinos, the means used to achieve this were different. In Tropicana the stealing took place without the knowledge and consent of the majority owner of the casino, and thus transporting stolen goods, 18 U.S.C. § 2314 (1982), is also charged in the indictment. In contrast, to achieve a hidden interest in the Argent casinos the defendants, in essence, purchased their interest through Glick. Stealing is thus not alleged in the Argent indictment. The fact that both indictments charge some of the same statutory violations is not particularly important. It is possible to have two different conspiracies to commit exactly the same type of crime.

The fourth factor concerns the nature and scope of the activity. The objectives are the same in both indictments, skimming money from Las Vegas casinos. Further, five overt acts overlap in the indictments. However, that leaves 20 in the Tropicana indictment and 70 in the Argent indictment that do not overlap. The Argent indictment concerns many overt acts which do not relate at all to the Tropicana operation, for example, the overt acts concerning the Balistrieris, the sale of Glick's interest in the Argent Corporation, and acts concerning Rockman. And, so long as agreements are made at different times to do two sepa-

rate illegal acts, the fact that both those acts involve skimming from casinos, does not mean that only one offense has been committed.

The last factor concerns location. Although it is true that Las Vegas is a center of activity in both indictments, and that Kansas City and Chicago were involved to some extent in both operations, our analysis does not stop here. Different casinos and different centers of control were involved in each case. The Tropicana trial involved the Tropicana casino. The agreement was made between Agosto (who resided in Las Vegas) and Kansas City, and control of the skimming operation was centered in Kansas City. The Argent indictment sets out an agreement between Milwaukee, Chicago, Kansas City, and Cleveland. It involves the Fremont and Stardust casinos, and control of skimming operation seems to be primarily from Chicago, with strong influence also coming from Kansas City.

In addition, appellants presented evidence in the double-jeopardy hearing that some government reports indicate only one conspiracy was being investigated. The government, of course, disputes this argument and claims it is irrelevant anyway. Whether the government agents believed they were investigating one conspiracy or two is not a controlling factor. The issue is one of law to be decided by the courts. The agents' belief (which may have changed as the investigation proceeded), is,

however, a factor which we have taken into consideration.[6]

After considering all the factors, we hold that two conspiracies are charged. As we stated above, the essence of the determination is whether there was one agreement or two, and we believe that the evidence shows there were two separate agreements, made at different times and by different people. The character of the hidden interest was different in each conspiracy, one was a purchased interest, and the other was obtained through an insider's infiltration. And it was Agosto in Tropicana, and Glick in Argent, who approached the organized crime groups to set up deals. The fact that the two conspiracies overlap at times does not prove that there was only one conspiracy. Since Kansas City had a major role in both conspiracies, there are bound to be occasions when events, dates, and people involved overlap.

### V.

We have reviewed the double jeopardy issue by comparing the indictments and looking at the totality of the circumstances. We will now consider other specific arguments made by Thomas regarding his participation in the conspiracies.[7]

Thomas argues that most of the knowledge imputed to him regarding the two conspiracies comes from a November 26, 1978, meeting. The government used electronic surveillance during that meeting and introduced the tapes during the Tropicana trial. The transcript of the meeting shows

---

6. We further note that on the Tropicana appeal to this Court, *United States v. DeLuna*, Nos. 83–2408, 83–2409, 83–2410, 83–2411, 83–2462, 84–1047 (8th Cir. argued Sept. 10, 1984), appellants argued in their briefs that two separate and distinct conspiracies exist, and that it was error for the District Court to allow evidence of this "other" conspiracy to be introduced into the trial. The appellants stated the other conspiracy (Argent) "involved participants, aims and conduct not charged in the [Tropicana] indictment, with a possible partial overlap of membership and overlap of time, but otherwise quite distinct from the charged conspiracy." Consolidated Opening Brief for DeLuna, C. Civella, Moretina, and Chiavola, Sr. at 29. (Thomas adopted the arguments of this brief.)

7. We do not agree with Thomas's argument that the charging of both conspiracies pursuant to a general conspiracy statute increases the likelihood of there being a single unified conspiracy. The case which he cites for this proposition, *Ward v. United States*, 694 F.2d 654, 661 (11th Cir.1983), actually states, "When, however, the separate conspiracies are both founded upon a general conspiracy statute, the relevant inquiry is whether there existed more than one agreement to perform some illegal act or acts." We agree with this statement and believe that we have applied it.

that Thomas set out the details of the skimming methods used at the Tropicana and Argent casinos for DeLuna, the Civellas, and Agosto. Thomas states that this evidence led to his conviction in Tropicana and was the basis for the grand jury's indictment in the Argent case. He believes that the tape of the meeting will be used against him in the Argent trial as well. He further argues that the November 26, 1978, meeting is the single most significant piece of the prosecution's evidence with respect to him, and that the government has failed to show or even allege that it will present new or different evidence against him in the upcoming Argent trial.

■■■ Thomas argues that the Court must look at the double-jeopardy issue from the individual defendant's point of view.[8] Since the evidence in both trials concerns primarily the November meeting, he says, he should not be tried again. We do not agree. The essence of a conspiracy is the agreement, and once a defendant's participation has been established he is culpable for everything said or done by any of the other conspirators in furtherance of the conspiracy. *United States v. Overshon,* 494 F.2d 894, 896 (8th Cir.), *cert. denied,* 419 U.S. 853, 95 S.Ct. 96, 42 L.Ed.2d 85 (1974). That the major item of evidence against one conspirator shows he participated in two unlawful agreements does not mean he can be prosecuted for only one of them.

Thomas argues that even if we decide to affirm the District Court's decision that the totality of the circumstances does not establish double jeopardy, he is still entitled to dismissal of the indictment under the "same transaction" test. He argues that the Double Jeopardy Clause of the Fifth Amendment requires that all the charges against a defendant that grow out of a single criminal act, occurrence, episode, or transaction be prosecuted in one

proceeding. The cases cited by Thomas for this proposition are primarily dissents by Justices Brennan and Marshall from denials of certiorari, and two concurring opinions. *E.g., Ashe v. Swenson,* 397 U.S. 436, 448, 90 S.Ct. 1189, 1197, 25 L.Ed.2d 469 (1970) (Brennan, J., concurring). These opinions do not represent the law. This Court rejected the "same transaction" test in *Moton v. Swenson,* 488 F.2d 1060 (8th Cir.1973), *cert. denied,* 417 U.S. 957, 94 S.Ct. 3086, 41 L.Ed.2d 675 (1974). In any event, we have found that two separate conspiracies exist and therefore these charges did not arise out of a single criminal act, occurrence, or transaction.

■■■ Our finding of two transactions also answers Thomas's argument that the government failed to follow its "Petite policy" that several offenses arising out of a single transaction should be alleged and tried together and should not be made the basis of multiple prosecutions. Yet even if only one transaction were involved, this policy would not create a right that Thomas can invoke to bar federal prosecution, see *United States v. Wallace,* 578 F.2d 735, 740 (8th Cir.), *cert. denied,* 439 U.S. 898, 99 S.Ct. 263, 58 L.Ed.2d 246 (1978).

### VI.

Appellants have asked us to find that at some point in time Kansas City, Chicago, Milwaukee, and Cleveland got together and decided to cooperate in skimming from Las Vegas casinos, and that skimming at the Tropicana was a continuing part of a conspiracy which started with the Argent agreement or before. We do not believe the evidence supports a finding of one agreement between all these parties to participate in skimming from various Las Vegas casinos. We believe that the evidence shows that there were two separate agreements, made at different times and be-

---

**8.** Thomas cites *United States v. Borelli,* 336 F.2d 376, 386 (2d Cir.1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965) in support of this argument. We do not find *Borelli* applicable to this case and do not believe it stands for the proposition Thomas cites it for. The issue in *Borelli* concerned the statute of limitations and the extent of the participation by defendants in a drug conspiracy where their acts had occurred five and seven years before the indictment.

tween different parties to skim money at different casinos.

In sum, we have found that the right of each appellant to be free from double jeopardy has not been violated. As the record stands now, the government has alleged a separate conspiracy and separate substantive offenses. That the offense now being prosecuted is similar, even closely similar, to a previous charge is not sufficient; the offense must be the "same" if it is to be immunized from prosecution and punishment by the Double Jeopardy Clause. The District Court was correct in holding that the offense charged in the Argent indictment is not the same as that charged in the Tropicana case.

Affirmed.