Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/19/2017 09:11 AM CST

State of Nebraska, appellee, v.
Robert S. Honken, appellant.
___ N.W.2d ___

Filed December 12, 2017.    No. A-17-195.

1. **Double Jeopardy: Lesser-Included Offenses: Appeal and Error.**
   Whether two provisions are the same offense for double jeopardy pur-
   poses presents a question of law, on which an appellate court reaches a
   conclusion independent of the court below.
2. **Sentences: Appeal and Error.** An appellate court will not disturb a sen-
   tence imposed within the statutory limits absent an abuse of discretion
   by the trial court.
3. **Judgments: Words and Phrases.** An abuse of discretion occurs when a
   trial court's decision is based upon reasons that are untenable or unrea-
   sonable or if its action is clearly against justice or conscience, reason,
   and evidence.
4. **Effectiveness of Counsel: Appeal and Error.** Whether a claim of inef-
   fective assistance of trial counsel may be determined on direct appeal is
   a question of law.
5. **Judgments: Appeal and Error.** When reviewing questions of law,
   an appellate court resolves the questions independently of the lower
   court's conclusion.
6. **Double Jeopardy.** The Double Jeopardy Clauses of the federal and
   Nebraska constitutions protect against three distinct abuses: (1) a second
   prosecution for the same offense after acquittal, (2) a second prosecution
   for the same offense after conviction, and (3) multiple punishments for
   the same offense.
7. **Constitutional Law: Double Jeopardy.** The protection provided by
   Nebraska's double jeopardy clause is coextensive with that provided
   under the U.S. Constitution.
8. **Criminal Law: Conspiracy: Double Jeopardy.** Under the Double
   Jeopardy Clause, the subdivision of a single criminal conspiracy into
   multiple violations of one conspiracy statute is prohibited.

9. **Double Jeopardy.** The traditional test used to determine whether two charged offenses constitute only one offense is the *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), or "same evidence," test.

10. ____. Under the *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), or "same evidence," test, the offenses are considered identical for double jeopardy purposes where the evidence required to support conviction on one offense is sufficient to support conviction on the other offense.

11. ____. A totality of the circumstances test for purposes of double jeopardy considers five factors: (1) time, (2) identity of the alleged coconspirators, (3) the specific offenses charged, (4) the nature and scope of the activity, and (5) location.

12. **Conspiracy.** The principal element of a conspiracy is an agreement or understanding between two or more persons to inflict a wrong against or injury upon another, although an overt act is also required.

13. ____. A conspiracy is ongoing until the central purposes of the conspiracy have either failed or been achieved.

14. **Conspiracy: Proof: Presumptions.** Upon proof of participation in a conspiracy, a conspirator's continuing participation is presumed unless the conspirator demonstrates affirmative withdrawal from the conspiracy.

15. **Conspiracy.** Withdrawal from a conspiracy must be effectuated by more than ceasing, however definitively, to participate in the conspiracy.

16. ____. A coconspirator must make an affirmative action either by making a clean break to the authorities or by communicating abandonment in a manner calculated to reach coconspirators and must not resume participation in the conspiracy.

17. ____. In order to constitute multiple conspiracies, the agreements must be distinct and independent from each other.

18. ____. There may be a continuing conspiracy with changing coconspirators so long as there are never fewer than two conspirators.

19. ____. A gap wherein there are fewer than two coconspirators breaks the continuity and the subsequent appearance of a new and different coconspirator creates a new and separate conspiracy.

20. ____. It is necessary for one conspiracy to end before a second distinct and separate conspiracy can be formed; the question is whether there was a break, for an appreciable time, in the sequence of events, in order to categorize the agreements as separate and distinct.

21. ____. As a practical matter, the fact that a conspirator in a two-person conspiracy seeks a replacement for a departed would-be cohort is a strong indication of the failure of one conspiracy and the creation of another.

22. **Sentences.** When imposing a sentence, the sentencing court is to consider factors such as the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. However, the sentencing court is not limited to any mathematically applied set of factors.

23. ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

24. ____. Traditionally, a sentencing court is accorded very wide discretion in determining an appropriate sentence.

25. **Effectiveness of Counsel: Appeal and Error.** When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. Otherwise, the issue will be procedurally barred.

26. **Effectiveness of Counsel: Records: Appeal and Error.** The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question.

27. **Trial: Effectiveness of Counsel: Evidence: Appeal and Error.** An ineffective assistance of counsel claim will not be addressed on direct appeal if it requires an evidentiary hearing.

Appeal from the District Court for Hamilton County: Rachel A. Daugherty, Judge. Affirmed.

Mitchell C. Stehlik, of Lauritsen, Brownell, Brostrom & Stehlik, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

Inbody, Pirtle, and Riedmann, Judges.

Riedmann, Judge.

## INTRODUCTION

Following a stipulated bench trial, Robert S. Honken was found guilty of two counts of conspiracy to commit first degree

murder. The district court for Hamilton County sentenced him to 45 to 50 years' imprisonment on each count, to be served concurrently. Honken now appeals his convictions and sentences. Following our review of the record, we affirm.

## BACKGROUND

This case arises out of Honken's attempt to hire two different men to kill his wife. The parties agreed upon the following stipulated facts, which were submitted at trial:

On January 16, 2016, Honken contacted Derrick Shirley via text message regarding a construction job. Honken and Shirley met at Honken's residence on January 18. After meeting, Honken asked Shirley if he would kill Honken's wife. The parties entered into an agreement wherein Shirley would kill Honken's wife in exchange for monetary compensation.

Honken and Shirley communicated primarily through text messages. Following Shirley's subsequent arrest, law enforcement recovered 659 text messages between the parties from Shirley's cell phone. In the messages, Honken provided a substantial amount of information regarding his wife, her residence and property, and her daily routine to assist Shirley in planning her murder. The parties also discussed how the murder would occur, and Honken requested on several occasions that Shirley make the incident look like a robbery. Shirley admitted that in the course of his agreement with Honken, he drove by Honken's wife's residence approximately 20 times.

Honken gave Shirley $400 for the purchase of a firearm to kill his wife. Shirley asked a friend to purchase the weapon, a .22-caliber rifle, for him. The rifle was purchased on February 10, 2016, and Shirley took possession of it. Law enforcement later recovered the rifle from his residence.

The final message between Honken and Shirley was sent on February 16, 2016. In that message, Honken wrote to Shirley:

"I was just wanting to say thank you for backing down when you did. I had a short talk and I think it's going to

lead to more talks and possibly a [sic] end to all of this? I have [a] friend that said I have through the duration of the divorce to prove to her that I want things to work out. I have deleted the messages on my cloud and phone. Thank you again for backing down and I don't want you to ever reconsider what I requested of you before. I think it was a God [sic] thing that you stepped back. I would like the .22 when it works out because I have a friend down in the Harvard area that said he would keep it so me and the boys can rabbit hunt around his farm! I can't thank you enough for heading [sic] the call and backing down. This and any other messages will be deleted but I'll keep your contact information in the event we're able to work things out and de [sic] the remodel work. Thanks again. . . ."

Shirley later told law enforcement that he did not go through with the murder of Honken's wife because he "had prayed about it and just did not have the heart." Shirley had no further communication with Honken after the final message that Honken sent on February 16, 2016.

On February 24, 2016, Honken left a voice mail for Mario Flores regarding remodeling work at his home. In his voice mail, Honken identified himself as "Sam." Flores returned the call the next day, and the parties agreed to meet at a gas station in Aurora, Nebraska, on February 26. During the meeting, Honken asked Flores if he knew anyone "who could help him kill his wife." Flores responded that he did know people who could help, but that he would not get involved in it himself.

That same day, Flores contacted the Aurora Police Department to report his contact with "Sam." Flores met with an investigator from the Nebraska State Patrol, and during the meeting, Flores made a telephone call to "Sam" that was recorded by law enforcement. During the call, "Sam" stated multiple times that he wanted his wife to be killed, discussed the cost of hiring someone to do so, and discussed how and

when he would like her murder to occur. "Sam" repeatedly affirmed that he was serious about killing her and identified himself as "Robert," the owner of a business in Aurora. Honken told Flores that he had previously paid someone else $400 to kill his wife but that person had backed out and taken his money. While Honken stated he did not recall that person's name, he provided sufficient information that law enforcement was able to identify him as Shirley.

Flores told Honken that he did have the name and telephone number of someone Honken could hire and that this person would contact him in the next several days. Later that day, Honken texted Flores from a different telephone number and stated that he "would like the hitman" to contact him at that number because it was a prepaid cell phone and he intended to dispose of it when he no longer needed it.

On February 29, 2016, an investigator with the Nebraska State Patrol made a recorded telephone call to the number Honken provided and posed as a potential hitman. During the call, Honken identified himself as both "Rob" and "Sam." Honken advised the investigator that he was in need of his services. The investigator stated that he would call Honken again with a time and place for them to meet, and Honken responded that he would be able to do so.

Several hours later, the investigator placed another call to Honken and instructed Honken to meet him at a truckstop in Aurora. Honken drove to the specified location and met with the investigator in the investigator's vehicle. The investigator wore a wire during the meeting to record his conversation with Honken.

Honken told the investigator that he wanted his wife "'gone'" and that he would like her to be killed by March 4, 2016. When the investigator requested "$3000 up front," Honken said that he would be able to obtain the money within several days. He provided the investigator with a photograph of his wife, as well as a map of her residence. Honken showed the investigator his driver's license, identifying him

as Honken, and stated that the address on his license was his wife's current address. Honken provided the investigator with information as to what type of vehicle his wife drove and when she was likely to be home alone. He also requested that the investigator make her death "look like a robbery" and said that he wanted it to be done "'quick and easy.'"

The investigator requested $500 for expenses. Honken withdrew the funds from an automated teller machine inside the truckstop and gave them to the investigator.

Honken was pulled over shortly after departing the truckstop and placed under arrest. He admitted to law enforcement that he had hired Shirley and the undercover investigator to kill his wife. Regarding his agreement with Shirley, Honken stated that Shirley had contacted him approximately 3 weeks prior because he had gotten "cold feet" and decided not to go forward with their plan.

In March 2016, the State charged Honken with two counts of conspiracy to commit first degree murder in the county court for Hamilton County. Following a preliminary hearing, the county court found probable cause and bound the case over to the district court. Honken was charged with the same two counts, both Class II felonies, in district court. In the information, the State charged Honken in count I with conspiracy that began on or about January 1 through February 26, 2016. Count II charged Honken with conspiracy that began on or about February 26 through 29.

Honken filed a plea in abatement, asserting that the evidence at the preliminary hearing was insufficient to show probable cause that the alleged offenses had been committed and that he had committed them. At a hearing on his motion, Honken argued that he should have been charged with only one count of conspiracy rather than two. The district court overruled Honken's motion, finding that there was probable cause for two separate offenses.

Following the denial of his plea in abatement, Honken filed a motion to dismiss either count of the information, claiming

that charging him with both counts violated his right against double jeopardy. In response, the State filed an amended information in which it shortened the time period during which it alleged count I occurred. The amended information asserted that the first offense occurred between January 16 and February 16, 2016, rather than between January 1 and February 26.

Honken waived his right to a jury trial, and a hearing on his motion to dismiss occurred simultaneously with his bench trial on the stipulated facts set forth above. The district court overruled Honken's motion to dismiss, finding that Honken had engaged in two separate conspiracies, and found him guilty of two counts of conspiracy to commit first degree murder. Honken was sentenced to 45 to 50 years' imprisonment on each conviction, with the sentences to run concurrently. Honken now appeals from his convictions and sentences.

## ASSIGNMENTS OF ERROR

Honken assigns, restated, that the district court erred in (1) violating his right against double jeopardy by convicting and sentencing him to multiple punishments for the same offense and (2) imposing excessive sentences. Honken also argues that he received ineffective assistance of his trial counsel.

## STANDARD OF REVIEW

[1] Whether two provisions are the same offense for double jeopardy purposes presents a question of law, on which an appellate court reaches a conclusion independent of the court below. *State v. Huff*, 282 Neb. 78, 802 N.W.2d 77 (2011).

[2,3] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Loding*, 296 Neb. 670, 895 N.W.2d 669 (2017). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*.

[4,5] Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *Id*. When reviewing questions of law, an appellate court resolves the questions independently of the lower court's conclusion. *State v. Alarcon-Chavez*, 295 Neb. 1014, 893 N.W.2d 706 (2017).

## ANALYSIS

*Double Jeopardy.*

Honken argues that the district court erred in overruling his plea in abatement and his motion to dismiss and subsequently finding him guilty of two counts of conspiracy to commit first degree murder. He claims that his actions constituted one continuous conspiracy and that his convictions for two separate counts therefore violate his right against double jeopardy. Honken asserts that he had the same objective throughout the course of his agreements with both men he hired to kill his wife and that the addition of a new coconspirator did not mean that his original conspiracy with Shirley had ended.

[6-8] The Double Jeopardy Clauses of the federal and Nebraska constitutions protect against three distinct abuses: (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. *State v. Kleckner*, 291 Neb. 539, 867 N.W.2d 273 (2015). The protection provided by Nebraska's double jeopardy clause is coextensive with that provided under the U.S. Constitution. *Id*. Under the Double Jeopardy Clause, the subdivision of a single criminal conspiracy into multiple violations of one conspiracy statute is prohibited. See *United States v. Thomas*, 759 F.2d 659 (8th Cir. 1985).

[9-11] "The traditional test used to determine whether [two charged offenses constitute only one] offense is the *Blockburger* 'same evidence' test." See *United States v. Thomas*, 759 F.2d at 661. See, also, *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932). Under this test, the offenses

are considered identical for double jeopardy purposes where the evidence required to support conviction on one offense is sufficient to support conviction on the other offense. See *United States v. Thomas, supra*. However, the "'same evidence'" test has been found to be of questionable value in cases involving issues of conspiracy and double jeopardy due to the possibility that prosecutors could rely on the use of such test to draw up two sets of charges that include different overt acts. See *id*. at 662. Instead, other courts have adopted a "'totality of the circumstances'" test that considers five factors: (1) time, (2) identity of the alleged coconspirators, (3) the specific offenses charged, (4) the nature and scope of the activity, and (5) location. See *id*.

[12-16] Neb. Rev. Stat. § 28-202(1) (Reissue 2008) provides:

A person shall be guilty of criminal conspiracy if, with intent to promote or facilitate the commission of a felony:

(a) He agrees with one or more persons that they or one or more of them shall engage in or solicit the conduct or shall cause or solicit the result specified by the definition of the offense; and

(b) He or another person with whom he conspired commits an overt act in pursuance of the conspiracy.

The Nebraska Supreme Court has held that the principal element of a conspiracy is an agreement or understanding between two or more persons to inflict a wrong against or injury upon another, although an overt act is also required. See *State v. Henry*, 292 Neb. 834, 875 N.W.2d 374 (2016). Section 28-202(3) states that "[i]f a person conspires to commit a number of crimes, he is guilty of only one conspiracy so long as such multiple crimes are the object of the same agreement or continuous conspiratorial relationship." A conspiracy is ongoing until the central purposes of the conspiracy have either failed or been achieved. *Id*. Indeed, upon proof of participation in a conspiracy, a conspirator's continuing participation is presumed unless the conspirator demonstrates affirmative

withdrawal from the conspiracy. *Id*. Such withdrawal must be effectuated by more than ceasing, however definitively, to participate in the conspiracy. See *id*. Rather, a coconspirator must make an affirmative action either by making a clean break to the authorities or by communicating abandonment in a manner calculated to reach coconspirators and must not resume participation in the conspiracy. See *id*.

Honken argues that the district court violated his right against double jeopardy because his actions constituted one continuous conspiracy with both men he hired to kill his wife. He claims that he had the same objective throughout and that the only element that changed was the addition of a new coconspirator. Honken asserts that the district court's finding that his original agreement with Shirley had ended was in error because the central purposes of that conspiracy had neither failed nor been achieved, and therefore was ongoing.

We find little Nebraska case law that is pertinent to the determination of when one conspiracy ends for purposes of double jeopardy. However, looking beyond Nebraska, we find the analysis contained in *Savage v. State*, 212 Md. App. 1, 66 A.3d 1049 (2013) instructive. In *Savage v. State*, the defendant was sentenced on two counts of conspiracy to commit first-degree burglary. On appeal, he argued that the convictions violated double jeopardy principles because he was involved in only one conspiracy. The State argued, however, that his agreements with two separate individuals constituted two conspiracies.

[17-21] The court in *Savage v. State, supra*, found that in order to constitute multiple conspiracies, the agreements must be distinct and independent from each other. See *id*. It held that there may be a continuing conspiracy with changing coconspirators so long as there are never less than two conspirators. See *id*. Such a gap breaks the continuity and the subsequent appearance of a new and different coconspirator creates a new and separate conspiracy. See *id*. The court summarized:

> [I]t is necessary for one conspiracy to end before a sec-
> ond distinct and separate conspiracy can be formed. .
> . . The question is whether there was a "break," for an
> "appreciable time, in the sequence of events," in order to
> "categorize" the agreements as "separate and distinct."
> *Purnell v. State*, 375 Md. 678, 698, 827 A.2d 68 (2003).
> As a practical matter, the fact that a conspirator in a two-
> person conspiracy seeks a replacement for a departed
> would-be cohort is a strong indication of the failure of
> one conspiracy and the creation of another.

*Savage v. State*, 212 Md. App. at 25-26, 66 A.3d at 1063.

In the present case, while the statutory offenses that Honken
was charged with in both counts were identical, the counts
alleged that the offenses occurred over different and distinct
time periods. The amended information charged Honken, in
count I, with conspiracy to commit first degree murder on or
about January 16 through February 16, 2016. Count II charged
Honken with the same statutory offense, but alleged that it
occurred on or about February 26 through 29. As charged by
the State, a 10-day break separates the first conspiracy from
the second.

The stipulated facts presented at trial further support this
break in the timeline. The district court received into evidence
copies of the 659 text messages that Honken exchanged with
Shirley. The text messages began on or about January 16,
2016, and the last message was sent to Shirley from Honken
on February 16. The content of the final message that Honken
sent to Shirley repeatedly thanked Shirley for "backing out
of the plot" and "'backing down.'" It further indicated that
Honken had spoken with his wife and believed an end to
"'all of this'" may be forthcoming. He stated that he did not
want Shirley to ever reconsider what he had previously asked
Shirley to do. The stipulated facts also state that, while being
questioned following his arrest, Honken told law enforcement
that Shirley had contacted him approximately 3 weeks before
and "said he was getting cold feet and decided to not go

forward with killing [Honken's wife]." Honken then attempted to contact Flores on February 24, and the pair met on February 26. It was during this meeting that Honken asked if Flores knew anyone who would kill his wife.

It is apparent from the February 16, 2016, text that Shirley had advised Honken by that date that he no longer wanted to participate in the murder conspiracy. Ten days later, Honken asked Flores if he knew anyone who would kill his wife. This time period constitutes a break in the sequence of events sufficient to categorize the agreements as separate and distinct. The facts do not indicate that Honken was in contact with anyone regarding his plan to kill his wife during that time nor did he have an agreement with anyone to do so. In fact, his final message to Shirley on February 16 indicated that he no longer wished to pursue his plan to kill her and Honken specifically asked Shirley to never reconsider his previous request to kill his wife. While Honken later entered into an agreement with the same objective, this gap of 10 days between such agreements and the addition of a new and different coconspirator suggests that the later agreement was a new and separate conspiracy. See *Savage v. State*, 212 Md. App. 1, 66 A.3d 1049 (2013).

Furthermore, under Nebraska law, a conspirator may withdraw from a conspiracy through an affirmative action. One such manner of withdrawal is through communication of abandonment in a manner that is calculated to reach coconspirators and subsequent nonparticipation in the conspiracy. See *State v. Henry*, 292 Neb. 834, 875 N.W.2d 374 (2016). Here, it is clear that Shirley effectively communicated his abandonment of the conspiracy to Honken, his only coconspirator, and that Honken in fact received such communication, as he acknowledged in his final message to Shirley. It is undisputed that following February 16, 2016, Shirley had no additional communication with Honken nor did he later resume his participation in the conspiracy. These actions constitute Shirley's withdrawal from the conspiracy, effective

February 16. As a conspiracy necessarily requires an agreement between two or more persons, the affirmative withdrawal of one coconspirator from a two-person conspiracy terminates that conspiracy.

We also look to the totality of the circumstances test outlined in *United States v. Thomas*, 759 F.2d 659 (8th Cir. 1985), and the five factors used there in determining whether Honken had engaged in multiple conspiracies or one continuous conspiracy. The first factor to consider is time. As discussed above, the two counts of conspiracy cover two separate and distinct time periods: the first count occurred from January 16 to February 16, 2016, and the second count occurred from February 26 to 29. The stipulated facts do not allege any overlap between the two time periods, which are separated by a period of 10 days.

The second factor to consider is the identity of the coconspirators. Here, Honken's coconspirator in count I was Shirley. The evidence indicates that he withdrew from the conspiracy on or about February 16, 2016, and did not resume participation. The second count of conspiracy involved Honken contacting Flores, who then connected him with the undercover investigator that Honken believed he had hired to kill his wife. There is no overlap of identity between the coconspirators involved in counts I and II.

The third factor is the specific offenses charged. Both counts were brought under the same statute, § 28-202(4), as conspiracy to commit first degree murder.

The fourth factor is the nature and scope of the activity. While the objectives in both counts are the same, to kill Honken's wife, the overt acts taken in furtherance of this objective differ. In count I, Honken's agreement with Shirley, it is alleged that in pursuance of the objective, one or both of the parties exchanged $400, purchased a .22-caliber rifle, and drove around the residence of Honken's wife. Furthermore, it is clear from the text messages between Honken and Shirley that Honken provided substantial information regarding the

residence and his wife's routine to Shirley and that Shirley used that information to surveil Honken's wife and her property and even make contact with her. Shirley admitted that he had driven by her property approximately 20 times during the course of his agreement with Honken.

In count II, Honken's contact with Flores and subsequent agreement with the undercover investigator, it is alleged that in pursuance of the objective, one or both parties met at a previously specified location to discuss a murder for hire, paid $500 as a downpayment for the murder of Honken's wife, and provided the undercover officer posing as a hitman with a photograph of Honken's wife, as well as her address. While there are similarities between some of the overt acts taken in both counts and all of the acts were taken in pursuance of the same objective, there is no overlap between specific acts, and the actors, other than Honken, are entirely different.

The final factor to consider is location. Everything alleged in both counts took place in Hamilton County, Nebraska. However, in count I, the initial meeting between Honken and Shirley took place at Honken's residence in Aurora and Shirley's subsequent surveillance of Honken's wife took place in and around rural Hamilton County. In count II, the initial meeting between Honken and Flores took place at a gas station in Aurora and his meeting with the undercover officer took place at a truckstop in Aurora. The locations involved in each of the two counts are in relative proximity to one another but they do not overlap as to any specific locations.

After taking all five factors into consideration, we find that Honken engaged in two separate and distinct conspiracies. While there are some similarities between several of the factors, the only one in which there was overlap was the offenses charged. We do not find this factor dispositive. The remaining factors and surrounding facts indicate that Honken participated in two conspiracies that were separate in time, involved different coconspirators, and involved distinct locations and acts taken in furtherance of the conspiracies.

Honken's reliance on the proposition of law that a conspiracy is ongoing until its purpose has either failed or been achieved is misplaced. He ignores the fact that a conspirator may withdraw from a conspiracy through an affirmative act. We find that Shirley did withdraw from the conspiracy on or before February 16, 2016, which terminated the conspiracy with Honken. Honken did not engage in a new agreement with anyone to kill his wife until 10 days later, at his meeting with Flores. Shirley's withdrawal and the 10-day break in time between the two agreements indicate that Honken's subsequent conspiracy was separate and distinct from the first. This is further supported by the differences between the parties involved in each agreement, the specific locations involved, and the overt acts taken in furtherance of the agreements.

Because we determine that the district court correctly found that Honken engaged in two separate and distinct conspiracies, we find no double jeopardy violation and no merit to this assignment of error.

*Excessive Sentences.*

Honken argues that the district court erred in imposing excessive sentences. He claims that the court did not adequately consider mitigating factors such as his mental health issues and the lack of violence in the commission of the offenses. Honken also argues that the district court appeared to sentence him for each conviction as if the underlying offense, the murder of his wife, had taken place, rather than sentencing him for the conspiracy to commit such offense.

[22-24] When imposing a sentence, the sentencing court is to consider factors such as the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. However, the sentencing court is not limited to any mathematically applied set of factors.

*State v. Dehning*, 296 Neb. 537, 894 N.W.2d 331 (2017). The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*. Traditionally, a sentencing court is accorded very wide discretion in determining an appropriate sentence. *State v. Loding*, 296 Neb. 670, 895 N.W.2d 669 (2017).

Honken was found guilty of two counts of conspiracy to commit first degree murder, a Class II felony, and was sentenced to 45 to 50 years' imprisonment on each count, to be served concurrently. He was also given credit for 327 days served. Class II felonies are punishable by a minimum of 1 year's imprisonment and a maximum of 50 years' imprisonment. Neb. Rev. Stat. § 28-105 (Reissue 2016). Honken's sentences are both within the statutory limits.

Honken argues that the district court did not give adequate consideration to mitigating factors, such as his use of alcohol, sleeping pills, and OxyContin around the time of the offenses, as well as his prior suicidal thoughts. Honken claims that he had previously been a "law-abiding citizen" with only two traffic offenses on his record. Brief for appellant at 28. He argues that he was diagnosed as having bipolar disorder subsequent to his incarceration and believes his mental health issues had affected his actions in this case. Honken claims that the district court should have considered the fact that there was no physical violence involved in the commission of the offenses and that no one was physically harmed.

The evidence shows that Honken sought out two different men to kill his wife over a month apart and then planned how the murder was to occur in a deliberate and calculated manner. Honken's actions included frequent contacts with these men, often on a daily or near-daily basis. While Honken alleges that he was using various substances around the time of the offenses, nothing in the record suggests that he was under the influence of any such substances during the commission

of the offenses, which took place during a period of greater than 1 month. Similarly, there is nothing to suggest that his mental health was impaired either by his past suicidal thoughts or by any bipolar-related disorder when he committed these offenses.

Honken argues that no one was physically harmed in the commission of these offenses. However, as the district court pointed out at sentencing, that was due only to intervening actors. It is clear from the content of Honken's messages to the hitmen and the desperation of his tone that Honken's wife would have been dead if it had been up to him. While Honken argues that the district court improperly sentenced him as if the murder had actually occurred, such argument is not supported by the record. The sentences imposed were properly within the statutory limits for conspiracy to commit first degree murder.

We note that in imposing its sentences, the district court stated that it had considered the factors in Neb. Rev. Stat. § 29-2260 (Supp. 2015), the presentence investigation report, the hundreds of text messages between Honken and Shirley, Honken's statements to probation and during allocution, the victim impact statement and accompanying letters from the victim's friends and family, Honken's diagnosis of unspecified bipolar disorder and unspecified personality disorder, his history of anger issues, the fact that on several occasions Honken sought to have the underlying crime committed in front of his children, the eight sentencing factors specified above, and Honken's lack of acceptance of responsibility for his actions.

The crimes for which Honken was convicted were extremely serious and put his wife at great risk of bodily harm or death. Honken's persistence in seeking out someone to kill his wife is alarming, as are the lengths he went to in order to plan her death, such as providing her photograph, a map of her residence, details about her daily routine, and suggestions for how her death could occur. Honken made a lengthy statement

both in the presentence investigation report and during allocution, but he shifted blame for his actions onto Shirley, onto a friend who allegedly came up with the idea, and even onto his wife, whom he continued to blame for her shortcomings as a spouse. We do not believe that Honken truly understands the very serious nature of these offenses nor does he understand the consequences that his actions have had on others, including his three children. Because the sentences that were imposed are properly within the statutory limits, we find no abuse of discretion by the district court.

*Ineffective Assistance of Counsel.*

Honken claims that his trial counsel was ineffective for failing to raise potential defenses arising out of his mental health issues. He argues that the presentence investigation report indicated that around the time of the offenses, he had been drinking, as well as using sleeping pills and OxyContin; that he had previous suicidal thoughts; and that he had been later diagnosed with bipolar disorder. Although trial counsel raised these issues at sentencing, Honken claims that they should have been raised earlier as potential affirmative defenses.

[25-27] When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. Otherwise, the issue will be procedurally barred. *State v. Loding*, 296 Neb. 670, 895 N.W.2d 669 (2017). However, the fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question. *Id*. An ineffective assistance of counsel claim will not be addressed on direct appeal if it requires an evidentiary hearing. *State v. Abdullah*, 289 Neb. 123, 853 N.W.2d 858 (2014).

Honken contends that his trial counsel was ineffective for failing to raise his mental health issues as potential affirmative

defenses. However, we find that the record before us on direct appeal is insufficient to resolve this claim. We have nothing before us indicating whether Honken's trial counsel contemplated raising such issues as potential defenses, whether his failure to do so was strategic, when Honken's psychological evaluation took place, or what the results were of such an evaluation. Accordingly, we cannot determine based on the record before us whether Honken's trial counsel rendered ineffective assistance.

## CONCLUSION

Following our review of the record, we find Honken's assignments of error to be without merit or without a sufficient record to resolve on direct appeal and therefore affirm.

Affirmed.